## SCHNEIDER ET AL. *v*. LANSDALE ET AL.

[No. 86, October Term, 1948 (Adv.)]

*Decided, per curiam, October 6, 1948.*

*Opinion filed October 13, 1948.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Hubert A. Schneider*, with whom were *David E. Betts, John Sumner Wood* and *Morris Miller* on the brief, for Hubert A. Schneider et al.

*Frederic P. Lee*, with whom were *Carey E. Quinn* and *Albert E. Conradis* on the brief, for Board of Supervisors of Elections.

*James J. Hayden* and *R. Edwin Brown* for Charter Board.

*Thomas C. Kelley, Allen H. Gardner* and *Gerald D. Morgan* for Charter Committee.

*H. Warren Buckler, Jr.*, with whom were *Niles, Barton, Morrow & Yost* and *F. Barnard Welsh* on brief, for County Commissioners.

*H. Warren Buckler, Jr.*, and *Niles, Barton, Morrow & Yost* for Maryland-National Capital Park and Planning Commission, *amici curiæ*.

*T. Howard Duckett* and *Mitchell & Pershing* for Washington Suburban Sanitary Commission, *amicus curiæ*.

MARBURY, C. J., delivered the opinion of the Court.

This case was instituted by the appellant, a resident, taxpayer, voter and owner of a bond issued by Mont-

gomery County, to enjoin the Board of Supervisors of Elections of Montgomery County from submitting to the voters of that County at the election to be held November 2, 1948, a charter proposed under Article XIA of the Constitution of the State. After a demurrer had been overruled, other bodies, including the Charter Board which had prepared the charter, a civic association known as The Charter Committee of Montgomery County and the County Commissioners of the County were allowed to intervene and become parties defendant. The case was then submitted on bill and answer, and the Circuit Court for Montgomery County filed a decree on July 29, 1948, deleting from the proposed charter certain provisions which required the preparation of an expense budget and the making of necessary appropriations in the month of June each year, directing the President of the County Commissioners to publish the Charter, as deleted, with a copy of the decree once a week for two successive weeks before October 30, 1948, the first insertion to be in the week of October 10, 1948, enjoining the Supervisors of Elections from submitting the charter to the voters as the same was originally drawn, and directing them to submit it, as deleted, at the November election. The County Commissioners were ordered to pay the costs. From that decree, the complainant appealed and cross appeals have also been noted by all of the defendants. The Maryland-National Capital Park and Planning Commission, by leave of court, joined in the brief of the County Commissioners, as *amicus curiæ*. The Washington Suburban Sanitary Commission was also given leave to file a brief as *amicus curiæ*, and did so. We advanced the case, heard it on October 5, 1948, and by *per curiam* order reversed the decree and dismissed the bill of complaint.

The chancellors found that, under Article XIA, Section 3, of the Constitution, all "legislation" must be "enacted" within one month during the year, and that the proposed charter directed in Article II, Section 3 that "For the enactment of legislation, the County Council

shall sit in Legislative Session during May of each year." Other provisions in Article VI of the charter required public hearings on the expense budget of the county between June 10, and June 15, and the adoption of such budget and the passage of a resolution appropriating the necessary amount, following such hearings and not later than June 30th. These charter provisions, according to the chancellors, provided for the enactment of legislation, and violated the restriction in Article XIA on such enactment except during one month in the year, since the charter had previously designated the month of May as the legislative month. The chancellors, therefore, held these provisions in Article VI of the charter were unconstitutional, but not so inseparable from the other part of the charter as to prevent the remainder from being submitted to the voters.

The procedure required by Article XIA for the submission of a charter to the voters of a county is involved and somewhat clumsy. A petition of 20% of the registered voters of a county, or with 10,000 signatures, is presented to the Board of Election Supervisors, who must then provide at the next election for the election of a charter board of five registered voters. Nominations for such board are to be made by petition, signed by 5% of the registered voters, or by 2000 thereof. At the election the voters also vote whether or not such a charter board shall be created. It this vote is in the negative, the question is settled for the time being. If a majority is in favor of such a board, then the five nominees receiving the highest number of votes shall prepare within six months a charter or form of government for the county, and present it to the county commissioners. The latter then publish it in two newspapers within thirty days after it is filed with them, preparatory to its submission to the voters at the next election after its receipt. All of this has been done in Montgomery County with respect to the charter now before us in this case, and we are asked to determine only whether the charter, either as drafted, or as modified by the chan-

cellors, shall be submitted to the voters at the election in November 1948. It is not contended that there was any omission in procedure or any neglect of the constitutional requirements for submission. The objection raised was, as we have stated, to the substance of the charter prepared, and to its validity as a constitutional form of county government. In passing upon this point, we have not considered other provisions of the proposed charter, and our decision is not to be construed as passing upon them, nor upon the charter as a whole, except as to the specific objection raised to its validity.

Before we come to the substantive constitutional point, we have before us the contention made by the defendants that the courts cannot interfere with the legislative processes, and that enjoining the submission to the voters of a proposed charter is such interference. Many authorities are cited in support of this view, and they are impressive and persuasive. But in this State we have actually passed upon the validity of proposed constitutional or charter amendments, and have enjoined submission of an invalid charter amendment. *Williams v. Broening,* 135 Md. 226, 108 A. 781; *Jones v. Broening,* 135 Md. 237, 108 A. 785; *Hillman v. Stockett,* 183 Md. 641, 39 A. 2d 803. In the cases cited there were presented specific questions, which would necessarily have arisen after approval by the voters and which could just as conveniently be decided before submission as afterwards. In *Hillman v. Stockett, supra,* there was also presented another question, which might never arise and could never arise except in the event of adoption of both of two proposed amendments. This contingent and possibly moot question, the court declined to pass upon before submission to the voters. We think such a question is now presented as the court should consider in advance of submission. But in so doing we are deciding none of the questions which conceivably may arise as to the validity, construction or application of various other provisions of the proposed charter or of action taken thereunder.

The effect of the decision of the chancellors, if the charter is approved by the voters, will be that the adoption of the expense budget and the passing of a resolution appropriating the amount of the expense items (and presumably, to that end, the fixing and levying of the county tax, although, strangely enough, this important and necessary function is nowhere mentioned in the charter) will have to be completed, as legislation, during the month of May. The charter, as they have ordered it submitted to the voters, is emasculated, and is not the charter submitted by the Charter Board. We have been referred to no case which authorizes the courts to strike out, before submission, part of a proposed enactment which the people are to vote upon. If they find such proposal partly invalid they may so hold but they cannot delete the invalid part and submit the remainder. The only charter which can be submitted, if any, is the one drafted by the Charter Board without deletions.

Unless we agree that the part of the proposed charter attempted to be deleted is invalid, it is unnecessary to consider whether this part is so inseparable from the remainder that its invalidity makes the whole invalid. In reaching the conclusion they did, we think the learned chancellors misconceived the question of construction before them. The basis on which they made their decision was the broad general proposition that the making of appropriations is a legislative function. The issue is much more narrow. It is whether the words "enact legislation" *as used in Article XIA, sec. 3 of the Constitution* embrace every exercise of legislative power, in the broadest sense of that term, and specifically such matters as the making of budgets and the appropriation of money for county expenses, debt, service, etc., which may be, at least in part, legislative functions. To determine this narrowed issue, we look to the context of Article XIA, Sec. 3, to the purposes behind the passage of the amendment, and to the situation as to county fiscal matters, existing prior to its passage, and continuing to the

present day in the twenty-three counties of the State, none of which has yet adopted a charter.

In the early days of the Province, county courts were established which had twofold duties, judicial and administrative. There were usually from six to ten commissioners, selected by the Governor from among the most prominent men in the county. These were the justices. In addition to their judicial functions, they were the administrators of the fiscal affairs of the county. They fixed the public levy, the county levy, and the amount of the poll tax, and performed a number of other duties which have survived in the county commissioners of the several counties. (See article treating of these early county courts immediately following the letter of transmissal, in the Archives of Maryland, Volume LII.) When the first State Constitution was adopted in 1776, no special provision was made for the levy of local taxes, although the county courts were mentioned several times, and it is evident that these courts were intended to exercise these duties, as in the Provincial government. However, in1794, by Chapter 53 of the acts of that year, levy courts were specifically constituted, composed of justices of the various counties, who were directed to meet and adjust the ordinary and necessary expenses, and to impose assessments or rates on all the property within the county to defray such county charges. During the next succeeding fifty years, these officials became generally known as county commissioners, and in the Constitution of 1851, Article 7, Section 8, it is provided that the county authorities, now known as levy courts or county commissioners, shall hereafter be styled county commissioners, and shall be elected by general ticket by the voters of the several counties. The Legislature was directed to provide their powers and duties. In the case of *Allegany County Board of Commissioners of Public Schools v. County Commissioners*, 20 Md. 449, it was stated "The levy courts for which the County Commissioners were substituted, had exercised from the organization of the State Government, the power of levying

taxes for every local purpose which the peculiar wants of each county might require, under the sanction of general or special Acts of Legislature." The short lived Constitution of 1864, Article 7, Section 5, continued the elective county commissioners and provided that they should exercise such powers and perform such duties as are now or may hereafter be prescribed by law, and the same provision is contained in our present Constitution, Article 7, Section 1. See *Cox v. Anne Arundel County*, 181 Md. 428, 31 A. 2d 179. The Legislature has, from time to time, authorized the performance of various duties by the county commissioners by general law, codified as Article 25 of the Code, and by special laws for each county. Article XIA provides that "all references in the Constitution and laws of this State * * * to the County Commissioners of the Counties" shall be construed to refer to the President and County Council of any county adopting a charter, whenever such construction would be reasonable, and that after the adoption of a charter the County Council "shall have full power to enact local laws of said * * * County including the power to repeal or amend local laws * * * enacted by the General Assembly, upon all matters covered by the express powers granted" by general law, (Section 3), and the power previously conferred upon the General Assembly to prescribe the number, compensation, powers and duties of the county commissioners is transferred to the voters of the county by the adoption of a charter. (Section 6.) Article 25A of the Code, granting express powers to chartered counties under the authority of Section 2 of Article XIA, enumerates in Section 3(A) the power to enact local laws, and separately and subsequently in Section 3(P) the power to assess property and to levy taxes. As a result, we have an unbroken line of county authorities from the original Provincial county courts to the County Commissioners at the present time, and continuing to a County Council, if one is established under a charter, all authorized to exercise the power of fixing the county expenditures and raising money to defray them. This is,

therefore, not a new power conferred upon the counties by Article XIA, but on the contrary is a power always previously exercised by some local agency in every county. It was not exercised, though it was authorized, by the General Assembly, and was not "legislation" in any ordinary sense in which the word is used.

The reasons actuating the submission of Article XIA to the people have been discussed by this Court in the case of *State v. Stewart*, 152 Md. 419, 137 A. 39. One was the desire to prevent the accumulation of proposed measures at the end of the sessions of the General Assembly, resulting in the passage of much legislation without proper consideration or scrutiny. This was an ancient problem. It had existed at least as far back as 1706 when Governor Seymour addressed the Assembly in these words "I am obliged to take Notice You make Use of a very unparliamentary Practice which is to Postpone Matters to the last Eight or tenn Hours of yor rising and then things of very greate Consequence are naturally hurryed up or so procrastinated that at our next meeting they are forgott." Maryland Archives, Vol XXVI, page 523. Another reason, (emphasized by the title "Home Rule Amendment" by which the article is usually designated) was the wish to permit local legislation to be enacted only by those affected by it, without possible interference by representatives from other sections of the State. The method of accomplishing these two desired results was to give some elected agency in each political subdivision the exclusive power to pass local laws. Power could have been granted by a simple Act of Assembly (*Gordon v. Montgomery Co.*, 164 Md. 210, 164 A. 676; Act 1947, Ch. 730, Code 1947 Supp., Art. 25, Secs. 2A, 2B, and 2C), but in order to confine that power, when availed of, to the local authorities, it was necessary to prohibit its further exercise by the Legislature, and this could be done only by a constitutional amendment. Hence, the submission by Chapter 416 of the Acts of 1914 and the adoption of Article XIA and the passage of the

supplemental legislation, codified as Article 25A of the Code.

Those who framed the amendment were fearful of a lawmaking body in continuous session, and therefore the new authority to legislate was carefully restricted. This authority was "to enact local laws * * * including the power to repeal or amend local laws * * * upon all matters covered by the express powers granted as above provided." (Section 3.) The express powers referred to were those directed to be granted by the Legislature by Section 2 of the amendment, which were subsequently granted and are to be found in Article 25A of the Code. Immediately following the definition of the authority in Section 3, as quoted, there was inserted a proviso that the charters should provide that "the County Council of the Counties shall not sit more than one month in each year *for the purpose of enacting legislation* for such Counties, and *all legislation* shall be enacted during the month so designated for that purpose in the charter, and *all laws and ordinances* so enacted shall be published once a week for three successive weeks in at least one newspaper published in such Counties, so that the taxpayers and citizens may have notice thereof." (Italics supplied.) Obviously this proviso referred to the new power given to enact, amend or repeal local laws. Under it, only the *laws and ordinances* enacted during the month's sitting had to be published. The construction of the word "legislation", as used in Section 3, to include other matters, partly legislative (*Gordon v. Montgomery County, supra*) and partly ministerial (*Cox v. Anne Arundel County, supra*), which do not require the enactment of laws or ordinances would lead us outside the purpose of the amendment. It would give a strained and unnatural meaning to the word to hold that it included such activities of the Council as the adjustment of the fiscal affairs of the county even if these activities included the appropriation of money by resolution. What those who drafted the amendment were trying to do was not to restrict county authorities in these duties long exercised by them.

The restrictions were intended to apply to the exercise of the power of local legislation, whether such exercise was by an enactment called a "law" or by one termed an "ordinance". The nomenclature used does not change this obvious intention, nor does it lead us to any other conclusion in the interpretation of the constitutional provision. We do not think the budget and levy making power is affected by the proviso in Section 3, and we hold that the budget and the appropriation and the tax levy are none of them "legislation" as the word is used in that proviso.

Since our conclusion is that the portions of the charter held invalid by the chancellors are not void, it follows that the charter (as drafted) should be voted upon at the November election. The decree was therefore reversed and the bill of complaint dismissed by the *per curiam* order previously passed. None of the other questions raised in the briefs, and in the argument, affects this result, and, as a consequence, we do not pass upon them, and we desire to emphasize again that our decision here does not involve any further construction of the proposed charter than we have indicated, nor have we passed upon it, except to decide the single point discussed in this opinion.