MONTGOMERY CITIZENS LEAGUE, ET AL. *v.* GREENHALGH, ET AL.

[No. 339, September Term, 1968.]

*Decided April 8, 1969.*

152

The cause was argued before HAMMOND, C. J., and MAR-
BURY, BARNES, SINGLEY, and SMITH, JJ.

*Joe M. Kyle,* with whom were *Heise, Kyle & Jorgensen* on
the brief, for appellants.

*David L. Cahoon, County Attorney,* and *Stanley D. Abrams,*

*Assistant County Attorney*, with whom was *Alfred H. Carter*. *Deputy County Attorney*, on the brief, for appellees.

HAMMOND, C. J., delivered the majority opinion of the Court. BARNES, J., dissents. Dissenting opinion, filed April 29, 1969, at page 165, *infra*.

After the decision in *Scull v. Montgomery Citizens League*, 249 Md. 271, cited hereafter as *Scull*, which held that the County Council of Montgomery County could enact laws only when sitting in legislative session and, therefore, that a fair housing law enacted when the Council was sitting in executive session was invalid and of no effect, the Council, sitting in emergency legislative session, again enacted a fair housing law, hereinafter sometimes referred to as Bill No. 18. The appellants, various individuals who alleged that they would be adversely and injuriously affected by the impact and operation of the new law, filed a bill (later amended), which alleged its invalidity and sought to enjoin the County Council, the executive secretary of the County's Human Relations Commission, the three members of the Commission's Panel on Housing, and the County Attorney from enforcing it. Judge Clapp sustained a demurrer to the bill, and later a demurrer to the amended bill without leave to amend.

. Bill No. 18 prohibits discrimination on the basis of color, religious creed, ancestry or national origin in the sale or rental of housing and in the lending of money for the purchase, construction or repair of housing; it prohibits the practice commonly called "blockbusting," including attempts to induce the sale of housing by representations as to the proximity of dwelling units occupied by persons of any particular race, color or creed and it establishes enforcement procedures such as the receipt and investigation of complaints by the executive secretary of the Human Relations Commission and the hearing and disposition of such complaints by the three members of the Commission's Panel on Housing appointed by the Council.

Appellants raise and argue here only three contentions which we state in what to us is an appropriate and orderly sequence: (1) Bill No. 18 is invalid because the purported emergency ses-

sion of the Council was not authorized by Art. XI-A of the Constitution of Maryland; (2) the Council did not declare a need for an emergency session on May 30, 1968, the day when Bill No. 18 was enacted; (3) the legislative powers delegated to the County Council did not embrace the power to pass a fair housing law.

When the Home Rule Amendment first became a part of the Constitution of Maryland in 1915, § 3 of Art. XI-A provided that in every home rule county there must be an elected legislative body "in which shall be vested the law-making power of said * * * County," a body given,

> "subject to the Constitution and Public General Laws of this State, * * * full power to enact local laws of said * * * County, including the power to repeal or amend local laws of said * * * County enacted by the General Assembly, upon all matters covered by the express powers granted as above provided * * *."

Section 3 went on to say:

> "Provided, however, that the charters for the various Counties shall provide that the County Council of the Counties shall not sit more than one month in each year for the purpose of enacting legislation for such Counties, and all legislation shall be enacted during the month so designated for that purpose in the charter."

In its first charter Montgomery County, obeying this constitutional mandate, named May as the legislative month. Although the Court of Appeals noted in *Schneider v. Lansdale,* 191 Md. 317, 327, that "Those who framed [Art. XI-A] were fearful of a lawmaking body in continuous session and therefore the new authority to legislate was carefully restricted," the restriction imposed was found to be unduly confining and frustrating and this led to the practice of the County Council of Montgomery County of enacting legislation while sitting in executive session, a practice found illegal is *Scull.* The restriction also led the legislature in 1955 at the suggestion of the Baltimore County Charter Board to propose an amendment to Art. XI-A so that the County Council of Baltimore County

could, under its proposed charter, meet at the call of the County Executive or any three councilmen on days other than those of the regular specified legislative session of the month of May.[1]

The amendment was ratified by the voters at the general election of 1956, the year the Baltimore County Charter was adopted. Under it, Art. XI-A, § 3 reads in pertinent part:

> "Provided, however, that the charters for the various Counties shall specify the number of days, not to exceed forty-five, which may but need not be consecutive, that the County Council of the Counties may sit in each year for the purpose of enacting legislation for such Counties, and all legislation shall be enacted at the times so designated in the charter * * *."

In 1966 the Charter of Montgomery County was amended to read:

> "For the enactment of legislation, the county council shall sit in legislative session from the 5th day of January through the 3rd day of February of each year.
>
> "If the council by a resolution approved by a majority vote of its members declares a need for an emergency extra session or sessions, such extra session or sessions may be held in addition to the aforementioned legislative session for a total period which does not exceed fifteen days. The said fifteen days may or may not be consecutive and may consist of one or more sessions."

It was under this charter provision that the emergency session which produced Bill No. 18 was called and we think permissibly so.

The new provision continued to forbid the legislative body of a chartered County to remain in session indefinitely. The

---

**1.** See the notes of the reporter to the Baltimore County Charter Commission p. 90, to the effect that "It is the opinion of the Charter Board that the adoption of the Constitutional amendment * * * while perhaps not essential to good government under the Charter, will certainly make the proposed form of government more workable. It will protect the legislative acts of the County Council from attack on narrow technical grounds.

1956 amendment to Art. XI-A. required specification in the charter only of the *number* of days (up to forty-five a year) to be devoted to lawmaking. These days could be particularized by pre-identification in the charter as Art. XI-A originally had required or, in conformance with the adage that that is certain which can be made certain, later could be made identifiable by following a procedure prescribed in the charter. Montgomery County and Baltimore County each availed itself of the more flexible alternative, Baltimore County by the mechanics of a call by the County Executive or three members of the Council for extra legislative sessions, and Montgomery County by using a resolution by a majority of the Council. It is not without significance that the interpretation we give to the language of the 1956 constitutional amendment was presented as the true meaning of that language by the Baltimore County Charter Board which proposed the amendment to the legislature and was made generally available to the voters who ratified it.

We see little substance and no merit to the argument that Bill No. 18 is invalid because there was no express separate declaration by a majority of the Council that May 30, 1968, was a legislative day. On April 30, 1968, the Council adopted a resolution that the public interest required an "emergency extra Legislative Session to commence at 7:30 o'clock p.m. on May 1, 1968." Bill No. 18 was introduced after the emergency session began and was the subject of public hearings on May 22 and May 23 in sessions described by the Council as executive sessions. Judge Clapp, in rightly rejecting appellants' contention on this point, noted that the allegations of the bill were that between May 1 when the bill was introduced and May 30 when it was passed the Council had adjourned its legislative session to six various future days and had so held such meetings, as well as other executive sessions, but that the legislative session that began May 1 was never adjourned *sine die* until May 31, but rather the legislative meetings held after May 1 were interim meetings adjourned from the original May 1 date. *Bond v. Baltimore City,* 111 Md. 364, 369-370, on which Judge Clapp relied, fully supports his holding. There the Court quoted with approval Roberts' Rules of Order as follows:

" 'A session is a meeting which, though it may last for

days, is virtually one meeting—as, for instance, a session of Congress, which meets for months. The only way to terminate a session is to adjourn *sine die,* or without day. The intermediate adjournments from day to day do not destroy the continuity of the meeting—they, in reality, constitute one session. An adjournment to meet again at some other time terminates the meeting, but not the session. The next meeting, in such a case as the one last mentioned, would be an adjourned meeting of the same session.' " [111 Md. at 369]

The Court held that:

"Other important legislation has been passed by the City Council in the same way this ordinance was, and as, in order to sustain it, it is only necessary to construe the charter to mean that the session of the City Council extends from its organization at the beginning of the first legislative year to the end of the second legislative year, during which the same members remain in office, and especially as we can find no valid reason for the contrary, we adopt that construction." [111 Md. at 370]

See also 4 McQuillin, *Municipal Corporations* (3rd Ed.) § 13.39, and 4 Antieau, *Local Government Law: County Law* § 32.06.

Appellants' argument that the Council lacked power to enact a fair housing or equal accommodation law, since it had not been delegated either the full police power of the State or a specifically enabling grant of such power, was found by Judge Clapp to be unsound. We agree.

The power of a political subdivision of this State to enact laws depends on the extent to which the General Assembly has delegated to it its legislative powers which "are plenary, except as limited by constitutional provisions," *Md. Committee v. Tawes,* 228 Md. 412, 439, *modified,* 229 Md. 406, *rev'd on other grounds,* 377 U. S. 656, 12 L.Ed. 2d 595, and the intent of the General Assembly is to be determined from the purpose and language of its enactments.

Article XI-A, § 1, describes how a County becomes a chartered County so as to enjoy home rule. Section 2 provides that the General Assembly shall by a public general law "provide a grant of express powers for such County or Counties as may thereafter form a charter * * *," and § 4 provides that after the adoption of a charter by any County no public local law shall be enacted by the General Assembly for that County on any subject covered by the express powers granted as provided in § 2. Section 3 requires of every charter that it establish an elective legislative body "in which shall be vested the law-making power of said * * * County." After the adoption of a charter a County Council:

> "subject to the Constitution and Public General Laws of this State, shall have full power to enact local laws of said * * * County including the power to repeal or amend local laws of said * * * County * * *, upon all matters covered by the express powers granted * * *."

By Ch. 456 of the Laws of 1918 the legislature added a new article to the Code titled "Chartered Counties of Maryland" to be codified as Art. 25A to provide a grant of express powers to chartered counties. Power was granted "to enact local laws for such county, including the power to repeal or amend local laws thereof enacted by the General Assembly upon the matters covered by the express powers in this Article granted * * *," and as to County property, franchises and institutions, fiscal affairs, elections, courts, health and nuisances, roads and streets, livestock, taxes, borrowings and credit, county officials, and there followed what is now § 5 (S) of Art. 25A:

> "The foregoing or other enumeration of powers in this Article shall not be held to limit the power of the County Council, in addition thereto, to pass all ordinances, resolutions or bylaws, not inconsistent with the provisions of this Article or the laws of the State, as may be proper in executing and enforcing any of the powers enumerated in this section or elsewhere in this Article, as well as such ordinances as may be deemed

expedient in maintaining the peace, good government, health and welfare of the County.

"Provided, that the powers herein granted shall only be exercised to the extent that the same are not provided for by Public General Law; provided, however, that no power to legislate shall be given with reference to licensing, regulating, prohibiting or submitting to local option, the manufacture or sale of malt or spirituous liquors."

The Council, having been given "full" legislative power as specified by Art. XI-A, is also given statutory power to pass "all" ordinances it deems expedient under the police power and the only limit on its powers is stated to be that such an ordinance cannot be inconsistent with the provisions of Art. 25A or the laws of the State, and the further provisos "that the powers herein granted shall only be exercised to the extent that the same are not provided for by public general law" and that "no power to legislate shall be given with reference to licensing, regulating, prohibiting or submitting to local option, the manufacture or sale of malt or spirituous liquors."

Control and supervision of the sale and renting of housing to prevent discrimination offer nothing inconsistent with Art. 25A and, indeed, would seem to be a logical extension or supplementation of the specifically granted powers to legislate as to the use to be made of real property (§ T) and full power to zone (§ X). The purpose and intent of the legislature in supplying the implementation called for by Art. XI-A by the passage of the express powers act was to take from the legislature and give to the County the exclusive power to enact local laws, and the reasons for this delegation of power, commonly called home rule, were first to reduce as far as possible the log jam of unacted on measures in the late days of the legislative session in Annapolis which had caused passage of laws that had not received careful scrutiny or due consideration and, second, "to permit local legislation to be enacted solely by those directly affected by it without interference from representatives of other sections of the State." *Scull,* p. 274 of 249 Md.

Gratification would not be afforded the purposes of home rule

or the reasons which prompted it if the language of § 5 (S) of Art. 25A were not to be construed as a broad grant of power to legislate on matters not specifically enumerated in Art. 25A and the language of that section clearly indicates that such a construction is sound. See 4 Antieau, *Local Government Law: County Law,* § 31.05. Similar power had been given Montgomery County in 1945 by Ch. 947 of the Laws of 1945 which survived the adoption of the charter and now in general substance is § 2-23 of the Montgomery County Code (1965). See *Scull,* pp. 283-284 of 249 Md.

A grant of power to pass laws for the peace, good government, health and welfare of the community is sometimes referred to as "a general welfare or general grant of power clause," 6 McQuillin, *Municipal Corporations* (3rd Ed.), § 24.43, and:

> "Under it ordinances may be passed which are necessary and beneficial, and they will be adjudged valid by the courts, provided they are reasonable and consonant with the general powers and purposes of the local corporation, and not inconsistent with the United States Constitution, treaties and statutes, and the laws and policy of the state."

It is true, as McQuillin points out in § 24.45 that a number of courts have taken the view that a general grant of power to a municipal corporation authorizes only the carrying out of the specific powers delegated to it, but even if it be assumed that such a point of view is sound in the abstract the language of § 5 (S) negates the idea that this was its intent, for not only does it empower legislative action designed to carry out, exercise and implement enumerated powers, it goes further to add that power is given "as well" to ordain for the maintenance of peace, good government, health and welfare of the County. McQuillin notes in § 24.44 that "A general welfare or similar clause, granting extremely broad power to a municipal corporation, is liberally construed to accord a municipality wide discretion in the exercise of the police power," and he says:

> "The cases, indeed, reveal an increasing judicial inclination under such a clause to accord to municipal au-

thorities wider discretion in the reasonable and non-discriminatory exercise, in good faith, of the police power in the public interest. While under the clause, or under the guise of it, personal and property rights recognized by general law and guaranteed by organic provisions cannot unreasonably be restrained, courts uniformly regard the clause as ample authority for a reasonable exercise, in good faith, of broad and varied municipal activity to protect the health, morals, peace and good order of the community, to promote its welfare in trade, commerce, industry and manufacture, and to carry out every appropriate object contemplated in the creation of the municipal corporation."

See also *Adams v. City of New Kensington* (Pa.), 55 A. 2d 392; *State v. Morrow* (Minn.), 221 N. W. 423; *Shepherd v. McElwee* (Ky.), 202 S.W.2d 166. The broadest grant of powers customarily is to home rule Counties, as 4 Antieau, *Local Government Law: County Law,* § 31.05, above cited, points out, and cases holding that a delegation was restricted or narrow are concerned almost always with delegations to municipalities that do not enjoy home rule.

A fair housing or equal accommodation law currently must prima facie be regarded as a reasonable exercise in good faith of the police power to protect the peace and good order of the community and to promote its welfare and good government. While in *Scull* we went no further than to hold the fair housing law invalid and ineffective because not passed in legislative session, it was implicit in the discussion of the case and its background that we thought the County had the power to pass such a law if it did so according to the legislative processes imposed upon it by the General Assembly. Our predecessors seemingly would, were they here to do so, agree. See *State v. Gurry,* 121 Md. 534, in which the power of Baltimore City to pass a segregation ordinance under which a white person could not live in a block in which lived black persons and a black person could not live in a block in which lived white persons was involved. The Court held that the ordinance was within the power of the City to enact and was constitutional since it lent itself to the

preservation of peace and the promotion of the general welfare. If a segregation ordinance promoted peace, the general welfare and good government when segregation was constitutional, it would be difficult if not impossible reasonably to conclude that an anti-segregation law would not promote peace, the general welfare and good government when segregation is unconstitutional.

The Supreme Court in *District of Columbia v. John R. Thompson Co.,* 346 U. S. 100, 97 L. Ed. 1480, held that Congress could delegate to the District the same power it could to a territory which is the power to legislate as to all matters on which a state can legislate; that a state may fashion its basic law so as to grant home rule or self government to its municipal corporations for the reason that, in the words of *Barnes v. District of Columbia,* 91 U. S. 540, 544, 23 L. Ed. 440, 444:

> "A municipal corporation, in the exercise of all of its duties, including those most strictly local or internal, is but a department of the State. The legislature may give it all the powers such a being is capable of receiving, making it a miniature State within its locality,"

and, therefore, the *Thompson* opinion continued:

> "[D]ecision after decision has held that the delegated power of municipalities is as broad as the police power of the state, except as that power may be restricted by terms of the grant or by the state constitution." [346 U. S. at 108-109, 97 L. Ed. at 1489]

The holding of *Thompson* was that when Congress delegated to the legislative body of the District power to ordain as to the "rightful subjects of legislation" it had delegated a power as broad as the police power of a state "so as to include a law prohibiting discriminations against Negroes by the owners and managers of restaurants in the District of Columbia." See *Stevens v. City of Salisbury,* 240 Md. 556. Recent State court decisions applying these same principles include: *Porter v. City of Oberlin* (Ohio), 205 N.E.2d 363; *Filippo v. Real Estate Commission of District of Columbia* (D.C. Ct. App.), 223 A. 2d

268; *Commonwealth v. Beasy* (Ky.), 386 S.W.2d 444; *City of New York v. Clafington, Inc.* (Sup. Ct. N.Y. County), 243 N.Y.S.2d 437; *Marshall v. Kansas City* (Mo. En Banc), 355 S.W.2d 877, 93 A.L.R.2d 1012; *Stanton Land Co. v. Pittsburgh* (C.P. Allegheny County, Pa.), 8 Race Rel. L. Rep. 1580; *Elsea v. Watts* (Cir. Ct. Wayne County, Mich.), 11 Race Rel. L. Rep. 392; Note, *Municipal Civil Rights Legislation— Is the Power Conferred by the Grant of Home Rule,* 53 Minn. L. Rev. 342 (1968). No doubt can remain as to the power of a state legislature to prohibit discrimination in public accommodations and housing.

In *Jones v. Mayer Co.*, 392 U. S. 409, 20 L.Ed.2d 1189, the Supreme Court held that an 1866 federal statute (42 U.S.C. § 1982) that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property" bars "*all*" racial discrimination, private as well as public, in the sale or rental of property, and that the statute, thus construed, is a valid exercise of the power of Congress to enforce the Thirteenth Amendment." See also *Hunter v. Erickson*, 393 U. S. 385, 21 L.Ed.2d 616, in which a negro citizen of Akron sued to compel city officials to enforce a municipal fair housing ordinance and to process his complaint of being unlawfully prevented from purchasing a house. The trial court had held the enforcement provisions invalid under Ohio law but the Supreme Court of Ohio had reversed. The trial court on remand held that the ordinance had been rendered ineffective by an amendment of the City charter providing that any ordinance of the City Council dealing with racial, religious or ancestral discrimination in housing was not to be effective unless approved by a majority of the City's voters. The Ohio Supreme Court affirmed but the Supreme Court of the United States reversed, holding that the charter amendment discriminated against minorities and constituted a denial of equal protection of the laws under the Fourteenth Amendment.

These controlling constitutional and legal rules were recently applied by this Court in *Barnes v. State, Ex Rel. Pinkney,* 236 Md. 564, where we upheld the constitutionality of a statewide law which prohibited discrimination because of race. creed. color

or national origin of any person by the owner or operator of a place of public accommodation. Judge Oppenheimer for the Court pointed out that at common law inns and common carriers were under a duty not to discriminate and that:

> "What the Legislature has done in the public accommodations law is to extend that duty to carefully limited places of public accommodations which, while not public utilities, like them, are open to the general public for the supplying of necessities. Such an extension is within the legislative discretion, under the police power, to determine what measures are necessary or appropriate for the protection of the health, morals or welfare of the people. The courts will not interfere with the exercise of that power, if the regulation is not arbitrary, oppressive or unreasonable, even though its exercise may inconvenience individual citizens. See *Davis v. State,* 183 Md. 385, 396-98, 37 A. 2d 880 (1944)." [236 Md. at 576-577]

We sum up our views on this aspect of the case by a paraphrase of *State v. Gurry, supra,* at p. 541 of 121 Md., in which Judge Constable for the Court said:

> "If then the Legislature could pass a statute under the police power of the State, providing for the segregation [or forbidding the segregation] of the races, as we think it could, there would seem to be no doubt that the Mayor and City Council of Baltimore [and Montgomery County] can pass a valid ordinance having the same end in view."

No challenge has been made to specific provisions of Bill No. 18 and, as in *Hammond v. Lancaster* 194 Md. 462, we find no need at this time to rule on any of its particular provisions.

*Order affirmed, with costs.*

BARNES, J., dissenting:

I dissent for four reasons: (1) under Article XI-A of the Maryland Constitution the Montgomery County Council had no authority to sit for the enactment of legislation on days not speci-

fied in the Charter of Montgomery County; (2) assuming, *arguendo,* that the Charter could permit the enactment of legislation on unspecified days in an "emergency legislative session", Bill No. 18 was not within the "emergency" for which the "emergency legislative session" was called; (3) the County Council had no power under the Express Powers Act or otherwise, to pass Bill No. 18; and, (4) under both Article XI-A, Section 3 of the Maryland Constitution and Article II, Section 3 of the Montgomery County Charter, the County Council was improperly convened on May 30, 1968, the date on which Bill No. 18 was passed.

As the majority points out, Section 3 of Article XI-A of the Maryland Constitution was amended by Chapter 557 of the Acts of 1955. This amendment was ratified by the electorate at the general election of November 6, 1956. As originally enacted by Chapter 416 of the Acts of 1914, and ratified by the electorate at the general election of November 2, 1915, Section 3, in part, provided: "* * * that the County Council of the Counties shall not sit more than one month in each year for the purpose of enacting legislation for such Counties and *all* legislation shall be enacted during the month *so designated for that purpose in the Charter."* (Emphasis supplied)

In construing this language, our predecessors in *Schneider v. Lansdale,* 191 Md. 317, 327, 61 A. 2d 671, 675 (1948), stated:

> "Those who framed the amendment were fearful of a lawmaking body in continuous session, and therefore the new authority to legislate was carefully restricted."

As a corollary to this, it was deemed important by those who drafted Article XI-A that the citizens of the county *know from the Charter when the County Council was to sit* for the enactment of ordinances pursuant to the power granted under the Express Powers Act, and Section 3 so provided in mandatory form, i.e., that the County Council *"shall not sit"* more than the one month "so *designated* for that purpose in the charter."

In the amendment of 1956, the language of Section 3 was amended to eliminate the one month provision, and stated:

> "* * * the charters for the various Counties *shall*

*specify* the number of days, not to exceed forty-five, which *may* but need not be consecutive, that the County Council * * * may sit in each year for the purpose of enacting legislation for such Counties, and all legislation *shall be enacted at the times so designated* for *that purpose* in *the charter.* * * *."

It is clear to me that although the legislative days need no longer be consecutive, i.e., during "one month", two mandatory requirements were provided by Article XI-A as amended:

(a) that the legislative days—either consecutive or non-consecutive—could not in the total exceed forty-five days in each year, and

(b) that such legislative days—either consecutive or non-consecutive—*must be designated in the charter for that purpose.*

This second mandatory requirement *was a continuation of an identical requirement* for the *designation in the charter* of the month established for legislative action by the County Council. In short, the *same policy* in regard to the designation of the times for legislative action originally set forth in Article XI-A *was continued* in Article XI-A as amended in 1956.

The legislative intent of the framers of the 1956 Amendment is further evidenced by the fact that in the *same sentence* which was amended, the provisions requiring that "all laws and ordinances so enacted shall be published once a week for three successive weeks in at least one newspaper published in such counties, *so that the taxpayers and citizens may have notice thereof*" (emphasis supplied) were continued in the identical wording as appeared prior to the Amendment. These provisions make it clear that their primary intent, as to the entire section was to provide adequate and specific notice to the taxpayers and citizens of each county of the activities of their legislative bodies.

The language of the 1956 Amendment is clear to me and can have only one meaning, namely, that legislation may only be adopted by the County Council *at the times* so designated in the charter, whether they be consecutive or non-consecutive. The policy behind this mandatory requirement is carried out by the

language of the Amendment to Article XI-A. The construction placed upon this language by the majority, in my opinion, is not in accord with the specific language and defeats its purpose, as the present case illustrates. The majority states:

> "The 1956 amendment to Art. XI-A required specification in the charter only of the *number* of days (up to forty-five a year) to be devoted to lawmaking. These days could be particularized by pre-identification in the charter as Art. XI-A originally had required or, in conformance with the adage that that is certain which can be made certain, later could be made identifiable by following a procedure prescribed in the charter." (Emphasis in original)

In my opinion, this interesting observation is contrary to the express language of Article XI-A, as amended. The language of Article XI-A does not provide that the *County Council* may *state* when the legislative days shall occur, but that the *Charter shall specify* the number of days, not to exceed forty-five, *in each year* for the purpose of enacting legislation—and all legislation *shall* be enacted *at the times so designated* for that purpose in the Charter. It will be noted that the language is not that the Charter shall "indicate" or "state" the number of days, but shall *"specify"* the number of days, that is to say, shall make specific or "to mention or name, as a particular thing" as Webster's New Twentieth Century Dictionary (1950) of the English Language, Unabridged, defines "specify". When the clear meaning of the word "specify" is followed by the language "all legislation *shall* be enacted at the *times so designated* for that purpose *in the charter,"* it is clear to me that the Charter, itself, must "specify" and "designate" the legislative days—consecutive or non-consecutive—but not exceeding 45 days in all. I find nothing in the language of Article XI-A which would indicate any legislative intent that the *County Council* or a *County Executive* can by resolution, order or ordinance "specify" or "designate" the legislative days by way of so-called emergency sessions or otherwise. If that had been thought to be desirable, doubtless the General Assembly could have found words to express such an intention. It is clear that the meaning of the words

used is the primary source to learn the legislative intent and if the words are clear and unambiguous—as they appear to me to be in Article XI-A—we need look no further for the legislative intent. As we stated in *Atlantic, Gulf and Pacific Co. v. State Department of Assessments,* 252 Md. 173, 249 A. 2d 180 (1969), quoting with approval from *Maryland Medical Service, Inc. v. Carver,* 238 Md. 466, 477-78, 209 A. 2d 582, 588 (1965):

> "The cardinal rule of construction of a statute is to discover and to carry out the real legislative intention. *Barnes v. State, ex rel Pinkney,* 236 Md. 564, 574; 204 A. 2d 787, 792 (1962). *Casey Development Corp. v. Montgomery County,* 212 Md. 138, 129 A. 2d 63 (1957). The legislative intent is to be sought in the first instance in the words used in the statute and if there is no ambiguity or obscurity in the language used in the statute, there is usually no need to look elsewhere to ascertain the intent of the legislature. *Board of Supervisors of Election of Baltimore City v. Weiss,* 217 Md. 133, 141 A. 2d 734 (1958). See particularly the comprehensive review of the prior Maryland cases at pages 136 and 137 of 217 Md. If the legislative intent is expressed in clear and unambiguous language, this will be carried into effect by this Court even if this Court might be of the opinion that the policy of the legislation is unwise, or even harsh or unjust, if no constitutional guarantees are impaired by the legislation. *Schmeizl v. Schmeizl,* 186 Md. 371, 46 A. 2d 619 (1946)." (252 Md. at 177, 249 A. 2d at 182-83)

If there be any ambiguity in the wording of the Amendment, which I do not think is the case, it should be made abundantly clear by the immediately following provisions referring to publication in newspapers as well as by the explicit language of the last clause of the sentence (using the very word "notice") that the Charter must provide notice to the citizens of the county of when its legislative body is sitting. To require only that a *number* of days be designated in the Charter, as the majority states, is to render the provision meaningless, and to stifle the

intent of the framers to provide "notice" to the citizens of the county of legislative activity.

The 1966 amendment to the Montgomery County Charter, *in part*, recognizes that there was a requirement to designate the time and days the County Council would sit in legislative session and provides that it "shall sit in legislative session from the 5th day of January through the 3rd day of February of each year." This provision is in accord with, and carries out the policy expressed in Article XI-A. The second provision, however, —that by resolution of a majority of the members of the County Council a "need for an emergency extra session or sessions" could be decided which may be held in "addition" to the previously mentioned "legislative session" for a total not exceeding 15 days which "may or may not" be consecutive—is, in my opinion, null and void as contrary to the specific requirement of Article XI-A, as already set forth. Nor would it have been difficult for the provisions of the Charter to have complied with the mandatory constitutional requirement. If it were thought desirable to have legislative days in addition to the 30 days specifically designated from January 5 to February 3 in each year, the remaining 15 days could have been specified and designated during the remaining months, as for example, a legislative day on the first Tuesday of March, April, May, July, August, September, October, November and December and on the first Monday of June and continuing for the succeeding four days —a total of 15 legislative days—which I believe would have amply provided for any possible "emergency" with ample time in June to consider any fiscal or other problems possibly arising at that time. The citizens of the County would then *have known* when the legislative days would occur, be on the look-out for legislative action on those days, prepare themselves for attending hearings, etc., and thus the policy of Article XI-A would have been carried out—not frustrated.

The majority appears to take comfort in the notes of the reporter to the Baltimore County Charter Commission and indicates that: "It is not without significance that the interpretation we give to the language of the 1956 constitutional amendment was presented as the true meaning of the language by the Baltimore County Charter Board which prepared the amend-

ment to the legislation and was made generally available to the voters who ratified it."

I find nothing in the record which indicates that the interpretation of the Baltimore County Charter Board "was made generally available to the voters who ratified it," and I have no personal recollection of any such interpretation being presented at the time the amendment of 1956 was submitted to the voters. Nor do I find any support for this "interpretation" in the Official Reporter's Notes of the Baltimore County Charter Commission, a portion of which is quoted in the majority opinion. Pages 89 and 90 of the Reporter's Notes are as follows:

"Section 208. *Sessions of the County Council; Quorum; Rules of Procedure.*

"(a) *Annual Legislative Session.* Under Article XI A, Section 3 of the State Constitution in effect at the time of the preparation of this Charter, the county council of a chartered county is empowered to sit 'not more than one month in each year for the purpose of enacting legislation.' Such a month is required to be 'so designated for that purpose in the charter'. At the request of the Charter Board, a bill was enacted by the General Assembly at the 1955 Session, proposing a constitutional amendment which will enlarge this period to 45 days and will make it clear that such days need not be consecutive. This amendment is known as Chapter 557 of the Acts of 1955, and will be subject to a State-wide referendum at the general election in 1956, when the Charter will also be submitted to the voters of the County.

"The provisions of Section 208(a) were written with both the existing and the proposed constitutional provisions in mind.

"The existing constitutional provision has not proven burdensome in Montgomery County. The Court of Appeals of Maryland in *Schneider v. Lansdale,* 191 Md. 317, 61 A. 2d 671 (1948), held that the approval of the county budget and the fixing of the tax rate were not legislative acts of a character which had to

be performed during the one-month prescribed for legislation by Article XI A of the Constitution. This case has been construed by the Bench and Bar of Montgomery County as enabling the County Council to perform outside the thirty-day period any legislative acts which the County Commissioners could have performed prior to the adoption of the Charter. Support for this construction is derived from the rationale of the case and particularly a statement in the Court's opinion that the object of the constitutional provision 'was not to restrict county authorities in these duties long exercised by them.'

"It is the opinion of the Charter Board that the adoption of the constitutional amendment above referred to, while perhaps not essential to good government under the Charter, will certainly make the proposed form of government more workable. It will protect the legislative acts of the County Council from attack on narrow technical grounds.

"(b) *Other Sessions.* In the tentative draft of the Charter, this subsection was entitled 'Other Meetings'. The heading was amended so as to make it clear that the annual legislative session in May is a self-contained 'session' for parliamentary purposes. (*See* the technical distinction between a 'session' and a 'meeting' discussed in Robert's *Rules of Order,* revised edition, 1943, pages 22 and 254.) *The regular monthly sessions are designed to keep the legislative branch of the County in close contact with the affairs of the executive branch.*" (Emphasis supplied)

I find nothing in these Reporter's Notes contrary to what I consider to be the correct interpretation of Section 3 of Article XI-A, and indeed, the last sentence, which has been italicized, rather suggests that it was contemplated that a designated monthly session for the County Council would be—or had been —designated in the Baltimore County Charter. I find no suggestion in the portion of the Reporter's Notes quoted, that even suggests that the County Executive or the members of the

County Council could call an extraordinary emergency session of the County Council. In any event, it would make no difference, in my opinion, in the result in the present case if such a suggestion *had* been made in the Reporter's Notes inasmuch as the language of Article XI-A is clear and unambiguous and indicates a clear legislative intent that *all* legislative days be designated in the County Charters.

## (2)

If it be assumed for the purpose of this argument only, that the provision of the Charter purporting to provide for "emergency extra session or sessions" were valid and not in conflict with the mandatory requirements of Article XI-A, even then Bill No. 18 is invalid as not being encompassed within the "emergency" for which the "emergency legislative session" was called by the County Council.

On April 30, 1968, the County Council sitting in Executive Session adopted Resolution No. 6-1206, which was as follows:

> "BE IT RESOLVED by the County Council for Montgomery County, Maryland, pursuant to Article 11A of the Constitution of Maryland and Section 3, Article II of the Montgomery County Charter, as amended, that in order to resolve matters of business requiring legislation *relating to the organization and affairs of the government and bond enabling law* which could not be carried out or completed during the regular 30 day 1968 Legislative Session, and which in the public interest need to be concluded prior to the 1969 regular Legislative Session, the County Council hereby declares the need for an emergency extra Legislative Session to commence at 7:30 o'clock p.m. on May 1, 1968." (Emphasis supplied)

On May 1, 1968 the County Council, sitting in Executive Session, adopted Resolution 6-1222 which bore the heading "Amendment to Resolution 6-1206—Declaration of Need for Emergency Extra Legislative Session," and provided:

> "BE IT RESOLVED by the County Council for Montgomery County, Maryland, pursuant to Article

11A of the Constitution of Maryland and Section 3, Article II of the Montgomery County Charter, as amended, that in order to resolve matters of business requiring legislation *relating to the organization and affairs of the government and bond enabling law* which could not be carried out or completed during the regular 30 day 1968 Legislative Session, and which in the public interest need to be concluded prior to the 1969 regular Legislative Session, the County Council hereby declares the need for an emergency extra Legislative Session to commence at 7:30 o'clock p.m. on May 1, 1968, *and authorize the President of the Council to call any other day or days in May necessary to conclude the Council's need for Legislative Session or sessions.*" (Emphasis supplied)[1]

It will be observed that the amendment to Resolution 6-1206 is the portion last italicized purporting to authorize a call by the President of the County Council; otherwise, the Resolution of May 1, 1968 is identical with that of April 30, 1968.

As has been pointed out, the 1966 amendment to the Montgomery County Charter provides that the majority of the County Council may declare the "need for an emergency extra session" for a period not exceeding 15 days, which need not be consecutive and "may consist of one or more session."

In the present case, the County Council recited specifically the two classes of legislative business which required the calling of the "emergency extra legislative session" to begin May 1, 1968, namely (a) legislation relating to the organization and

---

1. This attempt to authorize the President of the County Council to call any other day or days in May was, in my opinion, an attempted unlawful delegation of legislative power by the Council and contrary to the express provisions of the Charter. In the present case, it appears that a majority of the Council, itself, designated the day to which it adjourned and reconvened "or at the call of the President." It does not appear that *the President* "called" the meeting on May 30, 1968 at which Bill No. 18 was passed, but that this meeting was an adjournment and reconvening authorized by a majority of the Council at its meeting of May 29, 1968. The invalid attempted delegation was, therefore, not used in the present case and hence is not a ground for reversal.

affairs of the government, and (b) the bond enabling law. It was further recited that these two matters of legislative business could not be carried out or completed during the regular 30 day 1968 Legislative Session and which in the *public interest needed* to be concluded prior to the 1969 regular Legislative Session. It was to complete those two uncompleted matters that the County Council declared the need for an emergency extra Legislative Session. The purpose of the Charter requirement of a declaration of a "need" for an "emergency extra session" is to advise the public in Montgomery County of the reasons for the call and what legislation will be considered during that call. This means that when the County Council makes the determination of the reasons for the need for the "emergency extra session" and designates the legislation to be considered at such a session, it is not at liberty to consider any other "non-emergency" legislation which would be considered at the regular succeeding 1969 Legislative Session.[2]

It is entirely clear to me that Bill No. 18 was not an emergency law and was certainly not one embraced within the two matters of legislative business which established the "need" for an emergency extra session of the County Council by the declaration and finding by the County Council itself.

Bill No. 18, although introduced on May 1, 1968, was passed on May 30, 1968. Public hearings were held on the bill on May 22 and 23 in session described by the County Council as "executive sessions". In my opinion, Bill No. 18 was not properly considered by the County Council at the "emergency extra session"

---

**2.** The County Council is limited by the Charter to what legislation it may consider at an "emergency extra Legislative Session" by its declaration of "need" and the legislative business for which the need arises. Its power differs in this respect from that of the General Assembly of Maryland at Extraordinary or Special Sessions in regard to which there is no constitutional limitation of the matters it may consider, except in the special situation which may arise under Article III, Section 52 (10) of the Maryland Constitution. The General Assembly, unlike the County Council, has all of the legislative powers of the State, not specifically limited by the provisions of the Maryland Constitution; the County Council only has those powers which are delegated to it by the General Assembly and as not further limited by the County Charter.

for the reasons stated. Not being within the purview of the legislative business for which the need for the emergency extra session was called, it should have been introduced and considered at the 1969 regular legislative session in due course.

### (3)

I am of the opinion that, in any event, the County Council had no power under the Express Powers Act or otherwise to pass Bill No. 18.

The question presented on this aspect of the case is assuming, *arguendo,* that the General Assembly might delegate to the County Council the power to restrict the alienation and leasing of land, the advertising of sales of real estate, or interests in it, in order allegedly to prevent discrimination because of race, color, religious creed, ancestry, or national origin, has the General Assembly made such a delegation? In my opinion, it has not. There is nothing in Code (1957), Art. 25A, § 5 enumerating the express powers granted to chartered counties which *specifically* grants this extraordinary power. The majority indicates that the power is granted as an incident of the power granted by § 5 (S) providing that the enumeration of the powers shall not limit the power of the County Council to pass all ordinances not inconsistent with the provisions of Art. 25A, "as may be proper in executing and enforcing any of the powers enumerated in this section or elsewhere in this article, as well as such ordinances as may be deemed expedient in maintaining the peace, good government, health and welfare of the county." See also the similar power granted to Montgomery County by Chapter 947 of the Acts of 1945 which survived the adoption of the Charter and in substance appears as § 2-23 of the Montgomery County Code (1965). This general provision has been distinguished by our predecessors from the *full grant* of the State's police power as was given to the Mayor and City Council of Baltimore by the General Assembly and now appears as Article II (27) of the Charter of Baltimore City, 1964 Revision (1969), which provides:

> "To have and exercise within the limits of Baltimore City all the power commonly known as the Police Power to the same extent as the State has or could

exercise said power within said limits; provided, however, that no ordinance of the City or act of any municipal officer shall conflict, impede, obstruct, hinder or interfere with the powers of the Police Commissioner."

*Rossberg v. State*, 111 Md. 394, 410-11, 74 A. 581, 582 (1909); *State v. Gurry*, 121 Md. 534, 540-41, 88 A. 546, 549 (1913).

We and our predecessors have held that a general grant of power like that contained in Article 25A, § 5 (S) does not give the power to the municipality to zone. As Judge (now Chief Judge) Hammond aptly stated, for the Court, in *Perry v. County Board of Appeals for Montgomery County*, 211 Md. 294, 303, 127 A. 2d 507, 511 (1956):

"It is held generally that a municipality has no inherent police power, and so has only as much as the Legislature has expressly delegated to it. *State v. Mott*, 61 Md. 297. This Court, in *Rushe v. Hyattsville*, 116 Md. 122, 126, adopted as the law the following statement from 1 *Dillon on Municipal Corporations*, 4th Ed., Sec. 89: '* * * a municipal corporation possesses and can exercise the following powers and no others: First. Those granted in express words; second, those *necessarily or fairly implied* in or incident to the powers expressly granted; third, those *essential* to the declared objects and purposes of the corporation—*not simply convenient, but indispensable.*' The Court then added: 'It is equally well settled that any fair and reasonable doubt as to the existence of the power attempted to be exercised must be resolved against the corporation, and in such case the power must be denied.' See also *Hanlon v. Levin*, 168 Md. 674, 677.

"It is the general rule, also, that a municipal corporation has no power to zone by virtue of a grant to it of general police power. 8 *McQuillin, Municipal Corporations*, 3rd Ed., Sec. 25.32 and Sec. 25.35; 1 *Yokley, Zoning Law and Practice*, 2nd Ed., Secs. 18 and 19; *Kline v. City of Harrisburg* (Pa.), 68 A. 2d 182; *City of Stuttgart v. Strait* (Ark.), 205 S.W.2d 35;

*City of Searcy v. Roberson* (Ark.), 273 S.W.2d 26. The reason for this rule is said to be that zoning was unknown to the common law and restricts the free use of property and the economic use of land, so that the courts have felt that nothing less than specific language of the Legislature gives municipalities the power to zone."

See also *Benner v. Tribbitt,* 190 Md. 6, 57 A. 2d 346 (1948).

It can hardly be contended that the provisions of Bill No. 18 were not "unknown to the common law" and do, indeed, restrict "the free use of property and the economic use of land," so that the same policy which has led us and our predecessors to hold that general powers like those in § 5 (S) do not give the power to zone, is present in regard to Bill No. 18.

In my opinion, the power to zone given by § 5 (X) and the power to regulate the repair and use of buildings given by § 5 (T) in no way give the power to restrict the alienation and leasing of lands, the financing of sales and of advertising in connection with the alleged prevention of discrimination because of race, color, religious creed, ancestry, or national origin. The power necessary to pass Bill No. 18 relates to *who* may purchase or lease land regardless of its location; the power to zone under § 5 (X) relates to the limitations of certain uses of land by any one based on the *location* of the land.

The majority relies upon the decision of our predecessors in *State v. Gurry, supra.* In my opinion this reliance is misplaced. In the first place, this Court in *Gurry held* that Section 2 of Ordinance of the Mayor and City Council of Baltimore No. 692, approved May 15, 1911 under which the defendant and appellee was indicted *was unconstitutional and void* as ignoring the vested rights of those who owned property prior to the enactment of the ordinance. Secondly, in the *dicta* upon which the majority appears to rely, our predecessors pointed out and relied heavily on the above-mentioned grant to Baltimore City of the full police power which the State, itself, could exercise.

Finally, it should be kept in mind that our predecessors have adopted and we still adhere to the "Dillon" Rule that munici-

pal corporations have no inherent police power and they have only such powers as have been expressly delegated to them or are necessarily or fairly implied in or are incident to the powers expressly granted, or are "essential to the declared objects and purposes of the municipal corporations—not simply convenient, but indispensable." *Rushe v. Hyattsville,* 116 Md. 122, 126, 81 A. 278, 279 (1911), quoting with approval from 1 Dillon, *Municipal Corporations,* 4th Ed. Sec. 89. Judge Burke, for the Court, in *Rushe* also stated:

> "It is equally well settled that any fair and reasonable doubt as to the existence of the power attempted to be exercised must be resolved against the corporation, and in such case the power must be denied." (116 Md. at 126, 81 A. at 279)

As Judge (now Chief Judge) Hammond, for the Court, stated in *Montgomery County Council v. Garrott,* 243 Md. 634, 642, 222 A. 2d 164, 168 (1966):

> "It is clear, however, that the Council is a political creature of delegated powers, that it can effectively act only within the limits of the powers delegated to it by the Constitution and the Legislature, *Ames v. Supervisors of Elections,* 195 Md. 543, 551, * * *."

In the light of the prior decisions of this Court, I am of the opinion that the County Council had no power under the Express Powers Act or otherwise to pass Bill No. 18.

### (4)

In any event, the majority, in answering the appellants' argument that May 30, 1968 (the date of passage of Bill No. 18) was not declared a legislative day by the majority of the Council, has conclusively established that the Council was improperly convened in violation of both Section 3 of Article XI-A of the Maryland Constitution and Section 3, Article II of the Montgomery County Charter, as amended.

The pertinent provisions of Article XI-A have already been set out above, but it should be pointed out again that by the Amendment of 1956, Section 3 states: "* * * the charters for

the various Counties shall specify the number of days, *not to exceed forty-five,* which may but need not be consecutive, that the County Council * * * may sit in each year * * *."

As the majority sets out in its opinion, the Charter of Montgomery County, as amended in 1966, now reads:

"For the enactment of legislation, the county council shall sit in legislative session from the 5th day of January through the 3rd day of February of each year.

"If the council by a resolution approved by a majority vote of its members declares a need for an emergency extra session or sessions, such extra session or sessions may be held in addition to the aforementioned legislative session *for a total period which does not exceed fifteen days.* The said fifteen days may or may not be consecutive and may consist of one or more sessions." (Emphasis supplied)

Yet the majority goes on to hold that no express declaration of May 30, 1968, as a legislative day was necessary as the Council never adjourned *sine die* after convening the session that began on May 1, 1968. In adopting the reasoning of Judge Clapp on this point, it states:

"Judge Clapp, in rightly rejecting appellants' contention on this point, noted that the allegations of the bill were that between May 1 when the bill was introduced and May 30 when it was passed the Council had adjourned its legislative session to six various future days and had so held such meetings, as well as other executive sessions, but that the legislative session that began May 1 was never adjourned *sine die* until May 31, but rather legislative meetings held after May 1 were interim meetings adjourned from the original May 1 date. *Bond v. Baltimore City,* 111 Md. 364, 369-370, on which Judge Clapp relied, fully supports his holding. There the Court quoted with approval Roberts' Rules of Order as follows:

' "A session is a meeting which, though it may last for days, is virtually one meeting—as, for instance,

a session of Congress, which meets for months. The only way to terminate a session is to adjourn *sine die,* or without day.

The intermediate adjournments from day to day do not destroy the continuity of the meeting—they, in reality, constitute one session. An adjournment to meet again at some other time terminates the meeting, but not the session. The next meeting, in such a case as the one last mentioned, would be an adjourned meeting of the same session." ' [111 Md. at 369]

"The Court held that :

'Other important legislation has been passed by the City Council in the same way this ordinance was, and is, in order to sustain it, it is only necessary to construe the charter to mean that the session of the City Council extends from its organization at the beginning of the first legislative year to the end of the second legislative year, during which the same members remain in office, and especially as we can find no valid reason for the contrary, we adopt that construction.' [111 Md. at 370]"

It is clear to me that if, as the majority states, the period from May 1, 1968, to May 30, 1968, indeed constituted a single session encompassing numerous meetings, then there is no other alterative than to find that Bill No. 18 was improperly passed. Under the Montgomery County Charter, Section 3, Article II, it is clear that a majority of the Council must declare the "need for an emergency extra session or sessions", but such session may not exceed fifteen days. If the period from May 1 to May 30, 1968, consisted of only one session, then it lasted more than fifteen days, but, on the other hand, if it consisted of several separate sessions, then it is clear that there was no separate declaration of need for an emergency session other than the resolution of the County Council of May 1, 1968, which called "for an emergency extra Legislative Session *to commence* * * * *on May 1, 1968."* In either event, the County Council was without authority, under its own Charter, to act on May 30, 1968.

Similarly, I believe it is inescapable that the County Council was acting in violation of Article XI-A, Section 3, by holding a legislative session on May 30, 1968. The majority has held, in its opinion, that:

"The new provision continued to forbid the legislative body of a charter County to remain in session indefinitely. The 1956 amendment to Art. XI-A required specification in the charter only of the *number* of days (up to forty-five a year) to be devoted to lawmaking."

Yet, by its interpretation that the period May 1-May 30, 1968, consisted of only one session, when taken with the regular 30 day session prescribed in the County Charter, it has established, prima facie, that the County Council sat for more than 45 days in one year. In addition, I am compelled to point out that this interpretation by the majority has left the door open for any County Council to declare an emergency session to commence on the first day of a particular year, and by not adjourning *sine die,* being free to conduct a legislative meeting any day during the course of the year. If this is not "remaining in session indefinitely", and in clear violation of Article XI-A, I am at a loss to explain the meaning of this phrase by the majority.

I would reverse.