SIERRA CLUB et al.

v.

Cecil D. ANDRUS, Secretary of the Interior and James T. Lynn, Director of Office of Management and Budget, et al., Appellants.

No. 75–1871.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 7, 1976.

Decided May 15, 1978.

See also, 169 U.S.App.D.C. 20, 514 F.2d 856.

Appeal from the United States District Court for the District of Columbia (D.C. Civil 74–1017).

Peter R. Taft, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., with whom Raymond N. Zagone, L. Mark Wine, Dirk D. Snel, Attys., Dept. of Justice and Steven Gottlieb, Asst. Gen. Counsel, Office of Management and Budget, Washington, D. C., were on the brief, for appellants. Also Edmund B. Clark, Atty., Dept. of Justice, Washington, D. C., entered an appearance for appellant.

Bruce J. Terris, Washington, D. C., with whom Zona F. Hostetler, Washington, D. C., was on the brief, for appellees.

Before BAZELON, Chief Judge, and LEVENTHAL and MacKINNON, Circuit Judges.

Opinion filed by MacKINNON, Circuit Judge, concurring in part and dissenting in part.

Opinion for the Court filed by LEVENTHAL, Circuit Judge.

LEVENTHAL, Circuit Judge:

The central legal issue in this case is whether and on what occasions the National Environmental Policy Act (NEPA) requires an agency to prepare an environmental impact statement (EIS) to accompany its annual budget request for the operation of a program having significant environmental consequences.

The particular program that occasioned the lawsuit is the National Wildlife Refuge System (sometimes referred to as System, or NWRS). The System is administered by the Department of the Interior's Fish and Wildlife Service (sometimes referred to as Service, or FWS).

Since the commencement of this suit, the FWS has prepared a programmatic environmental statement on the program which covers operation of the NWRS for the next ten years, centering on a projection of a roughly constant level of funding. No challenge has been made to the adequacy of this EIS. Rather, plaintiffs obtained, and now seek affirmance of, the district court's declaratory ruling that an EIS adequate to then existing circumstances is required with each annual budget request. We reject this *per se* position and hold that the statement prepared by the Service satisfies its NEPA obligations, subject to any future decision of the agency to reevaluate the program or a drastic change of circumstances affecting the operation of the program.

We affirm the district court's other declaratory ruling that the Office of Management and Budget (OMB) is required to develop procedures to fulfill its NEPA obligations in connection with the Budget process.

## I. BACKGROUND

### A. *The National Wildlife Refuge System*

The National Wildlife Refuge System consists of more than 350 refuges containing more than 30 million acres in 49 of the 50 states. The primary purposes of the NWRS are to preserve endangered species and to sustain populations of migratory birds, particularly waterfowl, by maintaining intact a diverse network of their natural habitats. A secondary purpose of the System is to provide for its educational and recreational use (study, observation, and hunting) by people.

The System is administered by the Service according to the provisions of several statutes.[1] Much of the refuge land was acquired during the 1930's. After a period of little growth during the 1940's and 50's, the System has been enlarged during the 60's and to the present, particularly in the area of wild rivers and of wetlands. (There has recently been increasing recognition of the contribution to the preservation of important wildlife made by wetlands, which have been rapidly depleted.) During this period of territorial growth, new statutory mandates (such as the Endangered Species Act of 1973, 16 U.S.C. §§ 1531–1543), and increased public use of the NWRS, the resources devoted to staff and maintain the Refuge System have not kept up with the rate of territorial growth.[2] Between 1973 and 1976, there was a 7% decrease in staffing, while the number of field stations in-

---

1. The most significant of these are:
   Fish and Wildlife Coordination Act of 1934, 16 U.S.C. 661 et seq.; Fish and Wildlife Act of 1956, 16 U.S.C. 742a et seq.; Migratory Bird Conservation Act, 16 U.S.C. 715 et seq.; and Endangered Species Act of 1973, 16 U.S.C. 1531 et seq.

2. Final Environmental Statement, Operation of the National Wildlife Refuge System, U.S. Fish and Wildlife Service, Department of the Interior, November, 1976 at I–8 through I–9 [hereinafter FES at I8–I9].

creased by 10 percent.[3] This has led to a substantial ($83 million) backlog of rehabilitation work, as well as unfulfilled construction work, new and replacement, e. g., water control structures, roads, and buildings.[4] Given the policy decision to plan for roughly constant total expenditure (approximately $43 million in 1974 dollars), the FWS focuses on a strategy of increasing the effectiveness of the NWRS in its primary conservation task, while gradually reducing its direct use by the public. The Service's statement (FES) analyzes the environmental consequences of this proposed strategy, alternatives, and mitigating measures.

## B. Plaintiffs' Contentions

Plaintiffs are three environmental organizations. Their standing will be discussed subsequently. They advance two arguments that section 102(2)(C) of NEPA[5] obligates the Service to prepare an EIS on each annual budget request for the System: (a) that past and present proposals to cut down on NWRS operations are "proposals for legislation . . . significantly affecting the quality of the human environment . . . ," or (b) that the NWRS is so vital to protection of the environment that the annual proposal on the scope and nature of its operation per se "significantly affect[s] the quality of the human environment."

Plaintiffs further contend that section 102(2)(B) of NEPA[6] requires OMB to develop procedures to assure consideration of environmental factors in the budget process, including identification of which budget requests have significant environmental consequences and what is required of the agencies of the executive branch in submitting these requests to OMB.

## C. District Court Decision

The district court granted summary judgment for the plaintiffs[7] on the basis of the per se argument concerning budget proposals for operation of a major environmental program such as the NWRS. The court relied on the guidelines implementing NEPA issued by the Council on Environmental Quality (CEQ). These guidelines explicitly include "requests for appropriations" within the definition of "action" for NEPA purposes.[8] The court also relied on cases requiring an EIS in connection with the request for appropriations to construct

---

**3.** *Id.* at 18.

**4.** *Id.* at 19.

**5.** Section 102(2)(C), 42 U.S.C. § 4332(2)(C), provides in pertinent part:

> The Congress authorizes and directs that, to the fullest extent possible:
>
> \* \* \* \* \* \*
>
> (2) all agencies of the Federal Government shall—
>
> \* \* \* \* \* \*
>
> (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a[n environmental impact statement]. . . .
>
> \* \* \* \* \* \*
>
> Copies of such statement . . . shall be made available . . . to the public as provided by section 552 of title 5, United States Code [the Freedom of Information Act], and shall accompany the proposal through the existing agency review processes.

**6.** Section 102(2)(B), 42 U.S.C. § 4332(2)(B) directs all agencies of the federal Government to:

> identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations.

**7.** *Sierra Club v. Morton [National Wildlife Refuge System]*, 395 F.Supp. 1187 (D.D.C.1975).

**8.** *National Wildlife Refuge System, supra*, 395 F.Supp. at 1188, *citing* 40 C.F.R. § 1500.5(a)(1) which provides:

> "Actions" include but are not limited to:
> (1) Recommendations or favorable reports relating to legislation including requests for appropriations.

CEQ was established by NEPA in part to oversee implementation of NEPA. Its guidelines, issued by authority of Executive Order 11514, § 3(h) (1970), 3 C.F.R. § 272 (1974), are entitled to considerable weight. *E. g. Scientists' Institute for Public Information v. AEC [SIPI]*, 156 U.S.App.D.C. 395, 404, 481 F.2d 1079, 1088 (1973); *Environmental Defense Fund v. TVA [Tellico Dam]*, 468 F.2d 1164,

or otherwise initiate a specific project.[9] The court took note of the programmatic environmental statement being prepared by the defendants, but held that since it was directed at the long range goals of the NWRS, it would not satisfy the NEPA requirement of an analysis specifically directed to the proposed action in a "finely tuned" manner.[10] Accordingly, the district court granted the plaintiffs declaratory relief that the defendants were in violation of NEPA, that an EIS was required on the annual budget proposal for the NWRS, and that OMB was required

> to develop formal methods and procedures which will, with respect to the Office's own administrative actions and proposals, identify those agency actions requiring environmental statements to be prepared, considered, and disseminated.[11]

## II. STANDING

The defendants challenge the summary judgment granted to plaintiffs in view of

their failure to adduce proof of injury in the face of defendants' denial of plaintiffs' standing and assertion of a disputed factual issue as to their injury.[12] Plaintiffs alleged in their complaint that their members use the Refuge System and are affected by the environmental impact of the proposal concerning the operation of the System.[13] Alternatively, plaintiffs assert that their organizational interests in disseminating the information which NEPA requires the proposing agency to compile and disclose provide standing under *SIPI, supra* note 8, 481 F.2d at 1087 n. 29. These allegations were not supported by affidavits in plaintiffs' motion for summary judgment.

There is little doubt in our mind that some of plaintiffs' hundreds of thousands of nature-oriented members use the Refuge System, so that at least one of them could thereby satisfy the "minimal" standing requirements of *Sierra Club v. Morton [Min-*

---

1178 (6th Cir. 1972); *Greene Co. Planning Board v. FPC,* 455 F.2d 412, 421 (2d Cir.), *cert. denied,* 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972); *Sierra Club v. Morton [Northern Great Plains Coal],* 169 U.S.App.D.C. 20, 35 n. 22, 37 n. 24, 514 F.2d 856, 871 n. 22, 873 n. 24 (1975) *rev'd on other grounds sub. nom. Kleppe v. Sierra Club,* 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976).

The Department of Interior's Manual is in accord with the CEQ Guidelines, stating:

> The following criteria are to be used in deciding whether a proposed action requires the preparation of an environmental statement:
> A. Types of Federal actions to be considered include, but are not limited to:
> (1) Recommendations or favorable reports to the Congress relating to legislation, including appropriations.

Department of the Interior Manual § 516.5, 36 Fed.Reg. 19344 (Oct. 2, 1971).

9. *National Wildlife Refuge System, supra,* 395 F.Supp. at 1182, *citing Environmental Defense Fund v. TVA [Tellico Dam],* 468 F.2d 1164, 1181 (6th Cir. 1972) and *Scientists' Institute for Public Information v. AEC,* 156 U.S.App.D.C. 395, 481 F.2d 1079 (1973) (development of the liquid metal fast breeder reactor).

10. *National Wildlife Refuge System, supra,* 395 F.Supp. at 1191.

11. *National Wildlife Refuge System, supra,* Civ.No. 74–1017, Order at 1 (D.D.C. June 6, 1975), J.A. 92.

12. "Plaintiffs have no standing to maintain this action." *National Wildlife Refuge System, supra,* Answer at 1 (Oct. 11, 1974), J.A. 22. "In order to prevail on their motion [for summary judgment], plaintiffs must demonstrate . . . that there have been significant reductions in refuge operations and that they have been injured. None of these facts have been proved." *Id.,* Defendants' Statement of Genuine Issues at 1 (Apr. 8, 1975) J.A. 65.

13. Plaintiffs, the Sierra Club, the National Parks and Conservation Association, and the Natural Resources Defense Council, are environmental-conservation organizations with combined memberships of approximately 200,-000. Typical of the standing allegations in the complaint is the following:

> Plaintiff Natural Resources Defense Council, Inc. (NRDC) is suing on behalf of itself and its members. Many of NRDC's members use the National Wildlife Refuges for recreational and other purposes, and are affected by the environmental impacts on these refuges from the proposals for legislation and other major federal actions described in this complaint. They have a right under NEPA to assess and comment on the environmental impacts of, and alternatives to, these proposals. This right is being denied by defendants' failure to fulfill their responsibility under NEPA.

*Id.,* Complaint at 5, (July 5, 1974), J.A. 11.

*eral King]*, 405 U.S. 727, 734, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) and *United States v. SCRAP [SCRAP I]*, 412 U.S. 669, 688–90, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).[14] Plaintiffs did not file specific affidavits to that effect. On the other hand, one can hardly say that the issue was sharply drawn by the defendants' pleadings. In their statement of genuine issues opposing summary judgment, the defendants denied that plaintiffs had "been injured" by operation of the Refuge System or budget decisions concerning the System.[15] However, this point was made in the context of defendants' denial of the allegation that there were plans to reduce the funding of the NWRS with consequent impairment of the Refuge System. Defendants' pleadings did not specifically contest the proposition that plaintiffs' members use and are affected by the System and how the FWS proposes to operate it, which was the underpinning of the *per se* argument accepted by the district court. While we do not minimize the importance of standing requirements, the issue is whether their disposition required a trial to resolve pertinent issues of fact. A trial is not automatically required by a general denial of standing. However, to avoid any possible implication of foreclosure or estoppel, we make it clear that on the remand for further proceedings, if there is a genuine issue as to use of the Refuges by plaintiffs' members, defendants may raise it in appropriate proceedings.[16]

## III. NEPA AND THE BUDGET PROCESS

### A. *Absolute Positions on NEPA Applicability*

■ The plaintiffs' position is simple and logical. NEPA requires "all agencies of the Federal Government" to prepare an EIS to accompany "every recommendation or report on proposals for legislation . . . significantly affecting the quality of the human environment."[17] The EIS guidelines of CEQ, the body established by NEPA to implement that statute, defines an "action" subject to the EIS requirement:

"Actions" include but are not limited to:

(1) Recommendations or favorable reports relating to legislation including requests for appropriations.[18]

**14.** *Sierra Club v. Morton [Northern Great Plains Coal]*, 169 U.S.App.D.C. 20, 34 n. 20, 514 F.2d 856, 870 n. 20 (1975), *rev'd on other grounds sub. nom. Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976).

**15.** *National Wildlife Refuge System, supra*, Defendants' Statement of Genuine Issues at 1 (Apr. 8, 1975), J.A. 65. *See* note 12, *supra*.

**16.** *Environmental Defense Fund v. TVA [Tellico Dam]*, 468 F.2d 1164, 1172 (6th Cir. 1972). The primary purpose of the EIS in the scheme of NEPA is to assure compliance with its mandate that agencies proposing legislation or action give due consideration to environmental factors. However, the EIS also serves the important additional function of informing other parts of the government and the public of the environmental consequences of the decision. *Jones v. D.C. Redevelopment Land Agency*, 162 U.S.App.D.C. 366, 375, 499 F.2d 502, 511 (1974). Thus, we have held that an organization with an institutional concern with informing both its members and the public on matters of public policy and decisions which fall within the concern of NEPA has a statutory right to the information which NEPA obliges the agency to compile in an EIS. *Scientists' Institute for Public Information v. AEC*, 156 U.S.App.

D.C. 395, 403 n. 29, 481 F.2d 1079, 1087 n. 29 (1973). In the case of a proposal for legislation—appropriations in *SIPI*, quasi-legislative approval by another agency in *Jones*—the organization has an interest in getting the environmental consequences of the proposal in the open and before the legislature in aid of its participation in the legislative process. The question arises whether this is a legal interest sufficient to maintain an action to enforce NEPA, in effect an interest created by the statute.

This alternative ground of standing was similarly alleged but not supported by affidavits. Since plaintiffs' standing is proper and more straightforward under the members' use doctrine of *Sierra Club v. Morton [Mineral King]*, 405 U.S. 727, 734–35, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), we do not anticipate that it will be necessary to pursue the "informational NEPA entitlement" issue in this case.

**17.** Section 102(2)(C), 42 U.S.C. § 4332(2)(C).

**18.** 40 C.F.R. 1500.5(a). *See* note 8, *supra*. More generally, the Supreme Court has stated:

[w]hen faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute

The other prerequisite of an EIS requirement, that the action significantly affect the environment, has been given a broad reading in favor of obtaining the benefits of an EIS in instances of borderline environmental significance.[19] Thus, according to the plaintiffs, an EIS is required in connection with the FWS's budget proposal for funding the upcoming fiscal year's operation of a program with great environmental significance, the NWRS.[20]

█ The defendants counter that the FWS's proposal to OMB is only an intermediate step in the budget process and that only the actual Budget submitted by the President could be considered a proposal for legislation, and that this presidential submission would be the earliest action possibly triggering NEPA.[21] Defendants deny that NEPA imposes any obligation on OMB in its preparation of the Budget; they rely on the confidentiality of the budget process, see 31 U.S.C. §§ 15, 24; and they claim that OMB and FWS are not "agencies"—either within the meaning of the Administrative Procedure Act, 5 U.S.C. § 551(1), or under NEPA—when they are acting as advisers and staff assistants to the President in making his Budget.

A similar issue has arisen in connection with the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and its applicability to entities within the Executive Office of the President. In *Soucie v. David*, 145 U.S. App.D.C. 144, 448 F.2d 1067 (1971), without deciding whether the APA definition of "agency" includes the President, we held the Office of Science and Technology (OST) to be an "agency" based on congressional understanding of its role assigned by the reorganization plan in which it was created and in which its position was equated to the Budget Bureau.[22] Congress added a definition of "agency" in the 1974 FOIA amendments to include:

. . . or other establishment in the executive branch of the Government (including the Executive Office of the President) . . .[23]

The legislative history makes it clear that Congress adopted the *Soucie* result. The Conference Report states:

With respect to the meaning of the term "Executive Office of the President" the conferees intend the result reached in *Soucie v. David*, 448 F.2d 1067 (C.A.D.C. 1971). The term is not to be interpreted as including the President's immediate personal staff or units in the Executive

by the officer or agency charged with its administration.
*Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). *See also E. I. duPont de Nemours v. Train*, 430 U.S. 112, 134–35, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977). This principle has full vitality as to agencies charged with implementing statutes passed with the objective of protecting the environment.

**19.** *Maryland-National Capital Park & Planning Comm'n v. U. S. Postal Service*, 159 U.S.App. D.C. 158, 168–69, 487 F.2d 1029, 1039–40 (1973).

**20.** Plaintiffs argue that
the National Wildlife Refuge System, by its very nature, size, and scope, is itself a vital part of the protection of the environment. Consequently, annual proposals for financing programs of the . . . System necessarily have significant effects upon the environment.
\* \* \* \* \* \*

[E]ven when the proposed budget is the same as, or more than, the prior year's budget, the proposal not to increase further the budget—to provide, for example, additional staff to protect the wildlife more adequately or service increasing numbers of visitors, to increase rehabilitation of deteriorating facilities, or to purchase more lands for the system—significantly affects the quality of the environment.
Brief for Appellees at 34–35.

**21.** *Aberdeen & Rockfish R. R. Co. v. SCRAP [SCRAP II]*, 422 U.S. 289, 320–21, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975).

**22.** *Soucie v. David*, 145 U.S.App.D.C. 144, 151, 448 F.2d 1067, 1074 (1971).
By virtue of its independent function of evaluation federal programs, the OST must be regarded as an agency, subject to the APA and the Freedom of Information Act.
*Id.* at 152, 448 F.2d at 1075.

**23.** 5 U.S.C. § 552(e).

Office whose sole function is to advise and assist the President.[24]

Preparation of the Budget is an aid to Congress as well as an instrument of presidential policymaking and control over the executive bureaucracy. OMB has a statutory duty to prepare the Budget, in addition to its multitudinous other management, coordination, and administrative functions.[25] Congress signified the importance of OMB's power and function, over and above its role as presidential advisor, when it provided, also by amendment in 1974, for Senate confirmation of the Director and Deputy Director of OMB.[26] Thus, OMB is not totally exempt from the FOIA by its definition of "agency." We are equally convinced that OMB is not exempt by definition from NEPA. Exactly what NEPA requires of OMB in the budget process in general is not presented on this appeal and awaits OMB's response to the district court's declaratory judgment that it is OMB's function, at least in the first instance, to delineate the appropriate scope of a NEPA obligation that would be both feasible and meaningful.

We now turn to the question of what NEPA requires, annually or occasionally, in connection with decisions about the operation of the NWRS.

### B. *Review of NWRS Operations*

Plaintiffs' logic-based contention (*see* note 20 and accompanying text *supra*) leads logically to the conclusion that an EIS would have to accompany every budget request for the annual operation of an environmental-conservation program, or indeed of an agency whose activities may have significant environmental impact.[27] The principle of *reductio ad absurdum* is part of the landscape of logic. Plaintiffs have not suggested a limiting principle to their logic.

Plaintiffs have put forward as an alternative an escape hatch that would limit the EIS requirement to instances of an alleged cutback in some aspect of NWRS activity, as in the level of NWRS staffing and maintenance, leveling of total expenditure, and lack of acquisition of new refuges.

■ The difficulty of limitation still obtains. Every agency has limited resources and has to establish priorities among its programs and activities within a program. Some areas and functions are given new emphasis, others are reduced. Some of these decisions, such as a decision to decline to expand the National Park System, may be of great environmental significance. In general, however, if there is no proposal to change the status quo, there is in our view no "proposal for legislation" or "other major Federal action" to trigger the duty under NEPA to prepare an EIS.

■ It would be absurd to require an EIS on every decision on the management of federal land, such as fluctuation in the number of forest fire spotters. We know of no case pushing NEPA to such extremes. The cases cited on this point by the plain-

---

24. S.Rep.No.93–1200, 93rd Cong., 2d Sess. 15 (1974), 1974 U.S.Code Cong. & Admin.News, p. 6293.

25. There is in the Executive Office of the President an Office of Management and Budget. There shall be in the Office a Director and a Deputy Director, both of whom shall be appointed by the President, by and with the advice and consent of the Senate. The deputy director shall perform such duties as the director may designate, and during the absence or incapacity of the director or during a vacancy in the office of director he shall act as director. The Office, under such rules and regulations as the President may prescribe, shall prepare the Budget, and any proposed supplemental or deficiency appropriations, and to this end shall have authority to assemble, correlate, revise, reduce, or in-

crease the requests for appropriations of the several departments or establishments.

31 U.S.C. § 16 (1976). *See also* H.Rep.No.93–697, 93rd Cong., 2d Sess. Appendix (1974); U.S.Code Cong. & Admin.News, 1974, p. 2778 for a summary of OMB's numerous other statutory duties.

26. 31 U.S.C. § 16, note 25, *supra*, amended by P.L. 93–250, § 1 (Mar. 2, 1974).

27. This would include, *e. g.*, the ICC, *see SCRAP II, supra*, 422 U.S. at 320–21, 322–27, 95 S.Ct. 2336; and the SEC, *see Natural Resources Defense Council v. SEC*, 389 F.Supp. 689 (D.D.C.1974); Civ.No. 409–73 (D.D.C. May 19, 1977), C.C.H. Fed.Sec.L.Rep. ¶ 96,057 (June 2, 1977).

tiffs involve initiation or construction of a new project, or a sale of federal resources.[28] The cases requiring an EIS in connection with appropriations requests involve proposals for construction or development of a project.[29] There is a danger of overburdening NEPA by spreading its mandate too widely. The environmental analysis required by NEPA is governed by the rule of reason, as we have held in determining the scope of realistic alternatives to the proposed action [30] and the intensity of the required analysis.[31] A rule requiring preparation of an EIS on the annual budget request for virtually every ongoing program would trivialize NEPA. In our view, section 102(2)(C) contemplates a "proposal" for taking new action which significantly changes the status quo, not for a routine request for budget approval and appropria-

tions for continuance and management of an ongoing program.

We hasten to add the qualification that NEPA may have application to those budget requests that follow or accompany an agency's painstaking review of an ongoing program. The need is for a reading of NEPA that harmonizes its words, its purposes, and the rule of reason. Hence, a "proposal for legislation," within § 102(2)(C), is not applicable when the budget and appropriation process is routine, but is fully applicable when the request for budget approval and appropriations is one that ushers in a considered programmatic course following a programmatic review. A review of such a nature reflects choices that should under NEPA be made in the light of a full consideration of pertinent environmental consequences and alternatives.[32]

**28.** *E. g., National Forest Preservation Group v. Butz,* 485 F.2d 408 (9th Cir. 1973) (exchange of national forest land for private land); *Minnesota Public Interest Research Group v. Butz,* 358 F.Supp. 584 (D.Minn.1973) *aff'd,* 498 F.2d 1314 (8th Cir. 1974) (en banc) (timber sales in Boundary Waters Canoe Area), 541 F.2d 1292 (8th Cir. 1976) (en banc); *Businessmen Affected Severely By the Yearly Action Plans v. D. C. City Council,* 339 F.Supp. 793 (D.D.C.1972) (rezoning tract to permit construction of commercial building).

**29.** The leading case for the proposition that an appropriation request is a "proposal for legislation" under *NEPA, Environmental Defense Fund v. TVA [Tellico Dam],* 468 F.2d 1164, 1181 (6th Cir. 1972), involved the construction of a dam and reservoir. *Accord, Realty Income Trust v. Eckerd,* 183 U.S.App.D.C. 427, 564 F.2d 447 (1977) (congressional committees' approval of construction of a federal building); *Atchison, Topeka, and Santa Fe Ry. v. Callaway,* 431 F.Supp. 722 (D.D.C.1977) (construction of dam and locks).

An EIS was required for the program to develop a liquid metal fast breeder reactor (LMFBR) in *Scientists' Institute for Public Information v. AEC,* 156 U.S.App.D.C. 395, 481 F.2d 1079 (1973). NEPA was held applicable to the LMFBR program on the basis of "a 'proposal for legislation' each year, in the form of appropriations requests by the [Atomic Energy] Commission." *Id.* at 404, 481 F.2d at 1088. The LMFBR program involved the development of a new energy technology and the expenditure of R & D funds which would partially determine the energy alternatives later available to the nation.

*Kleppe v. Sierra Club,* 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976) does not preclude the applicability of NEPA in this case. Its holding that no EIS was required was based on the finding that there was no program to analyze.

But there is no evidence in the record of an action or a proposal for an action of regional scope.

\* \* \* \* \* \*

In the absence of a proposal for a regional plan of development, there is nothing that could be the subject of the analysis envisioned by the statute for an impact statement.

*Id.* at 400–01, 96 S.Ct. at 2726. Here, there clearly is a program—the Refuge System, which the FWS treats as a program and on which it has prepared a programmatic EIS.

**30.** *Natural Resources Defense Council v. Morton [Outer Continental Shelf Leasing],* 148 U.S. App.D.C. 5, 12, 15, 458 F.2d 827, 834, 837 (1972) (cited with approval in *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 551, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

**31.** *Scientists' Institute for Public Information v. AEC,* 156 U.S.App.D.C. 395, 408, 481 F.2d 1079, 1092 (1973).

**32.** Such an appropriations request may have no more significant effect on the environment than the previous year's routine request (possibly in the same amount), but the change in context makes it a determinative and meaningful proposal for legislation.

We have no occasion at this time to consider whether, or in what instances, a "new look" may be required because of vastly changed circumstances, either by NEPA or perhaps by some other provision of federal law. Nor need we now consider whether a court may mandate any such duty to take a new look.

What we do hold is that an EIS is required when such a new look is had. A new look may be generated periodically and spontaneously as a matter of good management and revitalization of the bureaucracy. It may be a response to external stimulus, as when dramatically changed circumstances cry out for review, or perhaps to accommodate existing programs to changes in the agency's statutory mandate. It is clear that there is wide discretion in the agency to determine when such review will be conducted. That is the essence of government and administration. It is impossible to have a "new look" at everything all the time. When there is such a new look the ensuing request for appropriations is a "proposal for legislation" under NEPA.

■ We need not decide whether this kind of painstaking reappraisal of the NWRS was required at the time plaintiffs brought this lawsuit, because the FWS has since undertaken one. The Programmatic EIS evaluates the environmental consequences of the proposed operation of the NWRS and alternatives thereto over the next decade. The FWS has indicated that it intends to make an analysis from scratch at the end of those ten years; in the mean-

time it will update the environmental study in light of changed plans and circumstances.[33]

The Programmatic EIS sets forth the environmental consequences of the FWS's present plan to operate the NWRS at a roughly constant real level of expenditure with priority given to its conservation mission over public use—recreational and educational. It also considers the effects of alternate program priorities and expenditures. The adequacy of the EIS for what it is (a long-term strategy and analysis) has not been challenged by plaintiffs on appeal. The controversy presented to this court concerns the district court's ruling that an EIS is required in the future for each and every annual budget request. We hold to the contrary.

## C. *OMB's Obligation*

■ NEPA requires all agencies of the federal government to:

identify and develop methods and procedures, in consultation with [CEQ], which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations.[34]

This requirement is applicable to OMB as the agency responsible for preparation of the budget and other executive legislative proposals, a conclusion drawn from the Act itself and supported by the legislative history and administrative regulations.[35] Our

---

**33.** The principle of an agency's borrowing existing environmental analysis from available sources, *Natural Resources Defense Council v. Morton, supra* n. 30, at 15, 458 F.2d at 837, applies equally to a borrowing from an agency's own prior analyses.

**34.** Section 102(2)(B), 42 U.S.C. § 4332(2)(B).

**35.** *See* text at note 25, *supra*. The legislative history of NEPA indicates that Senator Jackson, the prime mover of NEPA, anticipated that OMB would play a large role in coordinating agency compliance with NEPA. *National Environmental Policy: Hearing on S. 1075, S. 237 and S. 1752 Before the Senate Comm. on Interior and Insular Affairs*, 91st Cong., 1st Sess. 116–17 (1969).

OMB's role is also identified in the CEQ Guidelines. CEQ's central role with regard to NEPA generally appears from Executive Order 11514, note 8, *supra*. The CEQ Guidelines issued pursuant to that Executive Order envision an OMB role in enforcing NEPA's "proposals for legislation" branch in this provision:

[CEQ] and [OMB] will cooperate in giving guidance as needed to assist agencies in identifying legislative items believed to have environmental significance. Agencies should prepare impact statements prior to submission of their legislative proposals to [OMB]. In this regard, agencies should identify types of repetitive legislation requiring environmental statements (such as certain types of bills affecting transportation policy or annual construct authorizations).

view that some but not all (and certainly not routine) requests for appropriation are "proposals for legislation" under § 102(2)(C) underscores a need, on the part of agencies, for guidance in determining when an EIS is required in connection with a budget request.

■ These observations clarify the obligation imposed by NEPA and OMB, as the key agency in the executive's budget formulation process, to give appropriate guidance to the agencies. The district court granted declaratory relief that NEPA requires:

> Defendant Director of the Office of Management and Budget to develop formal methods and procedures which will, with respect to the Office's own administrative actions and proposals, identify those agency actions requiring environmental statements to be prepared, considered, and disseminated.[36]

The parties have not focused on this aspect of the district court's ruling and we might treat it as not appealed. However, the government defendants might argue that it was implicitly subject to further consideration in the light of their main contention. And the rulings we have made on the type of budget and appropriation requests that require an EIS will obviously affect the obligation put on OMB. To avoid uncertainty, we have considered the matter and affirm the ruling that requires OMB to adopt procedures and appropriate regulations to comply with the obligations NEPA imposes on the budget process when it culminates in proposals for legislation under the principles previously discussed.

This is not an onerous task. Preparation of the Budget is OMB's central function in helping the President coordinate the policy of the agencies and establish priorities for his administration. As it stands, the declaratory judgment imposes a duty on OMB to initiate the delineation of the procedures required by NEPA in connection with the budget process.[37] This task will be eased and simplified, we anticipate, by our rulings identifying what types of requests to the legislature for appropriations do and do not require preparation of an EIS, as well as clarifying the bounds of an agency's discretion in undertaking a reevaluation of an ongoing program.

■ OMB will give consideration to how obligations under NEPA can be discharged without violating the principle that holds an agency's budget requests confidential prior to final review by the President. We do not expand on the problem here. For one thing, it was not developed by the government's appeal. Furthermore, we anticipate that the OMB will wish to ponder the matter afresh in light of the rulings in this opinion. The matter may be capable of resolution in a manner that presents program proposals in terms that permit an environmental analysis, without disclosure of dollar projections or other betrayal of genuine budget confidence. Since requirement of an environmental impact statement in connection with budget proposals will arise in relatively few instances, under the

---

40 C.F.R. § 1500.12(a).

Apart from the CEQ regulation, we find a specific duty in NEPA's requirement to "identify and develop methods and procedures," 42 U.S.C. § 4332(2)(B). In our view, this provision obligates OMB, in its core role as manager of the budget process, to promulgate guidelines to identify those budget or other appropriations proposals which are subject to the requirements of section 102(2)(C), 42 U.S.C. § 4332(2)(C), as "proposals for legislation."

**36.** *Sierra Club v. Morton [National Wildlife Refuge System]*, Civ.No. 74–1017, Order at 1 (D.D.C. June 6, 1975), J.A. 92.

**37.** Since this issue has not been focused in this case, we have not researched OMB's formal or

informal directives to the agencies for NEPA compliance, particularly in connection with their appropriations and other legislative proposals. *See* F. Anderson, *The National Environmental Policy Act*, in Federal Environmental Law 331–35 (E. Dolgin & T. Guilbert eds. 1974); W. Rodgers, Environmental Law, 705, 714 (1977). OMB may already have some guiding regulations in this area as a foundation for the required procedures and methods. In any event, the declaratory judgment obliges OMB to look at its procedures and methods for assuring inclusion of environmental values in the budget process and to revise them if necessary to conform to its views of what NEPA requires, consistently with this opinion.

principles we have set forth, and since proposals for major program reviews and changes can probably be disclosed in general outline, sufficient for impact statement purposes, without undercutting the objectives underlying budget-type secrecy, OMB can fairly be called on to develop a proposal that serves and harmonizes both NEPA and budget processes. Certainly the fact that a proposal is subject to further review by the Executive is no bar to NEPA's requirement for an environmental statement. On the contrary, NEPA calls for an EIS precisely so that environmental consequences may be taken into account before a final decision is reached by the executive official or agency.

## IV. CONCLUSION

NEPA has been salutary in heightening agency attention to environmental values, in part by requiring disclosure of environmental consequences. However, we cannot allow NEPA to be bloated, and indeed enfeebled, by pushing the logic of Section 102(2)(C) to ridiculous extremes. NEPA does not require an annual EIS on routine operation and maintenance of every program with significant environmental ramifications. Its rule of reason does not demand rethinking of everything all the time.

The Fish and Wildlife Service has undertaken a re-evaluation of the National Wildlife Refuge System, and has done an analysis of its long term plan for operation of the System. We are not presented with a challenge to the validity of that exercise of discretion. In view of the programmatic EIS it has prepared there is no further obligation under NEPA at this time.

The judgment obligating defendants to prepare an annual EIS on NWRS operations is reversed. We affirm the judgment declaring OMB's duty to develop methods and procedures to implement the NEPA obligation to provide environmental impact statements to accompany those proposals on budget and appropriations that are proposals for legislation. This duty, as set forth in this opinion, applies when the request for budget approval and appropriations is one that proposes a considered programmatic course following a programmatic review. OMB will have latitude to propose a method that harmonizes both NEPA and budget processes.

The case is remanded for further proceedings not inconsistent with this opinion.

*So ordered.*

MacKINNON, Circuit Judge, concurring in part and dissenting in part:

I concur in the foregoing opinion insofar as it reverses the declaration of the district court requiring defendants to prepare an Environmental Impact Statement (EIS) with each annual request for appropriations to operate the National Wildlife Refuge System (NWRS). In my opinion such requirement would be wholly unreasonable in that it would result in an interpretation of the NEPA never intended by Congress. The court's rejection of the Sierra Club's position has my concurrence, but because the opinion has attempted to rely on a flexible "rule of reason" approach, rather than heeding the straight-forward words of NEPA, its holding in my opinion does not go far enough in rejecting any EIS requirement for annual appropriation requests.

The court's opinion holds that a "rule of reason" must be applied limiting the language of the regulation. It bases this conclusion on the plain meaning of CEQ regulation 40 C.F.R. § 1500.5(a) which states that an "action" subject to the EIS requirement includes "recommendations or favorable reports relating to legislation *including requests for appropriations*" (emphasis added) and points out that if the contentions of appellee were upheld they would mandate the absurd result that all requests for appropriations would require EISs. The reasonable limitation so imposed is that routine requests for appropriations may be distinguished from intensive "new looks" at a program's budget, it being reasonable to require EISs of the latter but not of the former. Actually the only issue before us is the court's holding with respect to the annual appropriation request for the NWRS and so there is no necessity for any dictum as to the ultimate limits of the rule.

I agree that it would be unreasonable to require EISs for every major budget request. In addition to the unreasonableness of such construction of the statute, the intent of Congress and the uniform precedents from generations of legislative proceedings clearly indicate that Congress has never considered "requests for appropriations" to be either "proposals" or "proposals for legislation or major federal action." In my opinion the entire budget request process for the NWRS involved here is outside the EIS requirement of NEPA.

I

*Standing*

As a preliminary issue, I concur in that part of the court's opinion that directs the lower court on remand to consider the issue of whether or not the Sierra Club has standing. The lower court granted summary judgment for the appellees and in so doing must perforce have determined that they did have standing to bring this suit. The Sierra Club, however, submitted no affidavits indicating either that any of its members or its fellow appellees' members in fact used the Wildlife Reserves in question, or that their enjoyment of these areas would be in any way affected by the NWRS budget proposals. An organization which does not prove injury to itself or its members has no standing to challenge harm to the environment, *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); Davis, *Administrative Law in the Seventies* § 22.19 (1976). Here the complaint of the Sierra Club alleges injury, but these allegations have been denied and are not supported by any evidence of record. Allegations on which standing is premised must be both "true and capable of proof at trial," *United States v. SCRAP*, 412 U.S. 669, 688–689, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) (SCRAP I). In this case, where plaintiff's standing allegations are controverted, and particularly in light of the summary disposition effected by the lower court, it is necessary that the facts upon which standing is premised be not only alleged but demonstrated, *Northern Great Plains Coal Case, Sierra Club v. Morton*, 169 U.S.App.D.C. 20, 514 F.2d 856, 869–870 n.20 (1975), *rev'd on other grounds*, 427 U.S. 390, 95 S.Ct. 2718, 49 L.Ed.2d 576 (1976). In this record there is no evidence at all that appellees' allegations are "capable of proof." As the opinion of Judge Leventhal states, there seems little doubt that the Sierra Club can offer proof that some of its members make use of the Wildlife Refuges involved in this case, but appellees must offer proof of that fact, not merely allegations.

However, even though appellees do prove that some of their members use the Wildlife Refuges, they still must clear what is to my mind a much more difficult hurdle before they can be held to have demonstrated their standing. Appellants strenuously argue that there is no evidence that any of the budget requests submitted by the Department of the Interior and the OMB will result in the curtailment of any identifiable refuge or refuge activity. It may well be true that the staff reductions proposed will not in fact impair the quality of the Wildlife Reserves or their availability. Indeed, one affiant testified that such lands as wilderness areas are best managed by *not* being managed at all. This argument is not devoid of logic. Appellees must demonstrate that some denial of service to them, *i. e.*, the injury which allegedly gives them standing, "in fact results from" the challenged budget requests, *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 42–43, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *see also Linda R. S. v. Richard D.*, 410 U.S. 614, 617–18, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973); *King's County Economic Commercial Development Ass'n v. Hardin*, 476 F.2d 478 (9th Cir. 1973). The seemingly self-evident truth that a decline in funding will result in the decline of the quality of the service provided is overly facile when dealing with areas whose chief value in the environmental scheme lies in being preserved as nature would leave them. Moreover, unless appellees can demonstrate a causal connection between the proposed appropriation and some identifiable decline in one of its member's use of a

wildlife refuge, the Sierra Club is in effect asking this court to litigate not as to a particular injury, but, assuming any injury at all exists, as to a general injury suffered by the public at large, which courts may not be empowered to rectify, *Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 215–227, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974). On remand, the District Court must consider and require proof concerning these questions relating to standing.[1]

## II

*Budget Requests as "Proposals"?*

The appellees attempt to bring budget requests under the statutory language requiring EISs for "proposals for legislation or other major federal actions." Since it is my opinion that such requests are not "proposals," and even if "proposals," are not proposals for either legislation or major federal action, I find no merit whatsoever in the Sierra Club's argument.

Appropriation requests by departmental units cannot be considered "proposals" until they have achieved at least that degree of finality only attained when the President has formally determined to transmit the departmental request to Congress as part of his budget. *See Northern Great Plains Coal Case,* 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976) wherein the Supreme Court struck down a decision of the Court of Appeals which held that NEPA empowered a court to require the preparation of an impact statement to begin at some point prior to the formal recommendation or re-

port on a proposal. 427 U.S. at 404, 96 S.Ct. 2718. In finding such action outside the intent of the statute the Court stated:

The statute clearly states when an impact statement is required [that is] under the first sentence of § 102(2)(C) the moment at which an agency must have a final statement ready "is the time at which it makes a recommendation or report on a *proposal* for federal action." *Aberdeen & Rockfish R. Co. v. SCRAP,* 422 U.S. 289, 320, [95 S.Ct. 2336, 2356, 45 L.Ed.2d 191] (1975) (SCRAP II) (emphasis in original).

427 U.S. at 405–406, 96 S.Ct. at 2728. And further:

A court has no authority to depart from the statutory language and, by a balancing of court-devised factors, determine a point during the germination process of a potential proposal at which an impact statement *should be prepared.*

427 U.S. at 406, 96 S.Ct. at 2728 (emphasis in original).

It is clear that in the budget-making process there is no final proposal until the President includes the item in his budget to Congress. Not only are the suggestions made by OMB and the various agencies confidential until the President transmits them to Congress as part of his formal budget,[2] but moreover, the statutory and constitutional scheme governing the budget-making process make it clear that the task of submitting a proposed budget is solely a *presidential* responsibility.[3] It is not until the President himself has acted that any budget request has been *proposed.*[4]

1. Appellees also maintain that as an alternative to demonstrating customary "injury in fact" standing, they should be given standing because they were denied, by the NWRS and the OMB's failure to file EISs, "the information which would be provided by an environmental impact statement and the opportunity to comment on the statement and thereby to participate in the decisionmaking process." Brief for Appellees at 18. This novel theory of standing is, on the facts of this case, disposed of adversely to appellees' position by *United States v. Richardson,* 418 U.S. 166, 176–77, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974) and *The Mineral King Case, Sierra Club v. Morton,* 405 U.S. 727, 736, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) with sufficient conclusiveness that it does not merit

extended discussion here. It might be characterized as a claim that they had standing because they did not have access to facts that might have proved standing.

2. *See infra,* pp. ——–—— of 189 U.S.App. D.C., pp. 914–916 of 581 F.2d.

3. *See* § 207 of the Budget and Accounting Act, 1921, 42 Stat. 22, 31 U.S.C. § 16, as amended by § 101 of Reorganization Plan No. 2 of 1970, 84 Stat. 2085.

4. For an analogous situation where recommendations apparently even more final than OMB and certainly than agency budget requests were (and continue to be) not deemed final

The requests for supply that are forwarded through the various agencies and the OMB for final presidential approval are purely pre-decisional and under the statute do not constitute proposals which require filing an EIS, *cf. Aberdeen & Rockfish R. Co. v. SCRAP*, 422 U.S. 289, 320–21, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975) (SCRAP II). To a certain extent, it would make as much sense to require cabinet ministers to submit EISs on suggestions made at confidential cabinet meetings as it would to require EISs of the OMB—merely a unit in the Executive Office of the President[5] in this case. NEPA was never intended to apply to incipient requests.

### III

*Budget Requests as "Proposals for Legislation"?*

Even when the President has in fact transmitted his budget to Congress, assuming that such transmittal does indeed involve a "proposal," such proposals do not, to my mind constitute "proposals for *legislation* or major federal action" within the intendment of Congress. NEPA provides:

The Congress authorizes and directs that, to the fullest extent possible: . . .
(2) all agencies of the Federal Government shall—

(C) include in every recommendation or report on proposals for *legislation* and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public. as provided by section 552 of Title 5, United States Code, and shall accompany the proposal through the existing agency review processes . . .

42 U.S.C. § 4332(2)(C) (emphasis added).

The appellees have consistently contended throughout this litigation that the *annual appropriation requests* to finance the National Wildlife Refuge System are proposals by federal agencies (1) "for *legislation* or other major federal actions" significantly affecting the environment.[6] Appellees in-

---

until the President has approved them, *see C & S Air Lines v. Waterman Corp.*, 333 103, 114 (1948), where CAB orders as to certificates for overseas or foreign air transportation were not "mature" or susceptible to judicial review until approved by the President.

**5.** 31 U.S.C. § 16 (1970) provides: "There is in the Executive Office of the President an Office of Management and Budget."

**6.** Plaintiffs [appellees] contend that these *annual* proposals to finance the National Wildlife Refuge System are proposals by federal

agencies (1) for *legislation* significantly affecting the environment; and (2) for major federal action significantly affecting the environment. Consequently, plaintiffs submit, defendants are required by the National Environmental Policy Act (NEPA), 42 U.S.C. 4321, *et seq.*, to prepare, disseminate and consider statements concerning the environmental impacts of such proposals. Plaintiffs also claim that the Office of Management and Budget has failed to identify and develop the formal methods and procedures required by Section 102(2)(B) of NEPA and the Guide-

clude in this phase of their argument the contention that an EIS is required whenever the NWRS in any given year (1) does not initiate a request, as they had in the past, for appropriations to purchase additional lands for refuge," [7] and whenever (2) a request is submitted that involves a reduction or alteration of the use of appropriations.[8]

The rationale underlying these arguments, so far as the contention that these acts might constitute "legislation" is concerned, is that all functions of the agency have a vested right, which can be enforced by third parties, naturally and routinely to continue to receive the largest sums ever appropriated for a given purpose; and any change—even that of not continuing to expand the program by the purchase of *new* refuge areas at the same rate of increase as in the past—amounts to a change in the law, *i. e.*, to "legislation." In my view such a contention is completely unsupportable either as legal doctrine or as an interpretation of congressional intent. Judge Leventhal has referred to the absurd consequences it would entail and I agree with that conclusion.

Apart from the patent absurdity of the result suggested by appellee, I also find their claim in this respect to be contrary to the meaning that Congress has traditionally intended when it refers to "legislation." This conclusion is supported by the precedents in Congress that evidence the distinction in the mind of Congress, as to what does and what does not constitute *legislation*.

Traditionally, Congress has distinguished between "legislation" and an "appropriation." The congressional practice in this respect is set forth in L. Deschler's Procedure (1974):

> § 7. An item contained in a general appropriation bill must be authorized by law. Statutory authority for the appropriation must exist. . . . 119 Cong.

Rec. p. ——, 93d Cong., 1st Sess., June 5, 1973 [H.R. 8619].

*Id.* p. 266 (emphasis added). It is the law *authorizing* appropriations that Congress refers to as "legislation," not the subsequently resulting appropriations. All appropriations must first be authorized by laws which emanate from the select committee having jurisdiction of that function of government, not from the Appropriations Committee. This distinction in meaning is pointedly set forth in the House Rule prohibiting the inclusion of *legislation* in appropriation bills:

> § 1.1 The prohibition against inclusion of legislation in general appropriation bills is provided for by House rule. It states: "Nor shall any provision in any such bill or amendment thereto *changing existing law* be in order, except such as being germane to the subject matter of the bill shall retrench expenditures. . ." (Clause 2 Rule XXI.)
>
> § 1.2 Language in an appropriation bill changing existing law is *legislation* and not in order. 105 Cong.Rec. 12125, 86th Cong. 1st Sess., June 29, 1959 [H.R. 7978].

L. Deschler's Procedure, p. 295 (emphasis added).

While this rule is limited to general appropriation bills, the italicized passages clearly indicates that when Congress refers to "legislation" it means "changing existing law."

In the same vein, legislation is defined as "the function of making *rules* . . ." *Webster's Third New International Dictionary* 1291 (3d ed. 1961) (emphasis added). The supply of a sum of money is not the making of a rule. Thus congressional and common English usage make it clear that the furnishing of money for previously authorized purposes is not *"legislation."* The congressional precedents that support this interpretation are legion. However some

---

lines of the Council on Environmental Quality implementing the National Environmental Policy Act, 40 C.F.R. 1500.3.

Appellees' Brief, p. 3 (emphasis added).

**7.** *Id.*, p. 30.

**8.** *Id.*, pp. 29–34.

courts may have interpreted "legislation,"[9] it is the intent of *Congress* that controls. And in my view when Congress in the Environmental Protection Act referred to "legislation," with respect to legislation in Congress, it intended thereby to convey the same meaning as Congress customarily gives to the term when used in its own proceedings.

The construction of the Act here in question is controlled by what Congress intended and here as elsewhere Congress distinguished between "legislation" and "appropriations." For example, Congress also very pointedly makes the same distinction in the criminal code between "legislation or appropriations," 18 U.S.C. § 1913.[10]

Congress also distinguishes between "legislation" and "appropriations" in 22 U.S.C. § 2394(c)

> . . . any committee of the Congress charged with considering *legislation, appropriations* or expenditures under this chapter, has delivered . . . (Emphasis added.)

In addition 42 U.S.C. § 2996e(c)(2)(B) refers to communications

> in connection with *legislation or appropriations* directly affecting the activities of the Corporation. (Emphasis added.)

Some courts have also noted the distinction. Justice Harlan in *Barenblatt v. United States*, 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959) stated:

> Since Congress may only investigate into those areas in which it may potentially *legislate or appropriate*, it cannot inquire into matters which are within the exclusive province of one of the other branches of the Government.

360 U.S. at 111–12, 79 S.Ct. at 1085 (emphasis added).

This court in *Nixon v. Sirica*, 159 U.S. App.D.C. 58, 487 F.2d 700 (1973) stated:

> Congressional control over *appropriations and legislation* is an excellent guarantee that the executive will not lightly reject a congressional request for information, for it is well aware that such a rejection increases the chance of getting either no legislation or undesired legislation.

159 U.S.App.D.C. at 66, 487 F.2d at 778 (emphasis added), quoting from Bishop, *The Executive's Right of Privacy: An Unresolved Constitutional Question*, 66 Yale L.J. 477, 486 (1957).

In *Schneider v. Lansdale*, 191 Md. 317, 61 A.2d 671 (1948) the court noted that the circuit court had based its decision on the

> broad general proposition that the making of appropriations is a legislative function. The issue is much more narrow. It is whether the words "enact legislation" *as used in Article XIA, Sec. 3 of the*

---

9. *Cf. Environmental Defense Fund v. TVA*, 468 F.2d 1164 (6th Cir. 1972), where the court overlooked that the CEQ Guideline it relied upon referred to "*legislation* including that for appropriations," i. e., "legislation including *legislation* for appropriations," which would refer to *authorizations* for appropriations. 468 F.2d at 1181; *Scientists' Institute for the Public Interest, Inc. v. AEC*, 156 U.S.App.D.C. 395, 481 F.2d 1079 (1973) contains the same approach. 156 U.S.App.D.C. at 403, 481 F.2d at 1088. Neither of these cases take stock of the congressional intent evident in its use of the terms "legislation" and "appropriations" for more than a hundred years. This should not be lightly disregarded in favor of loose street language. After all, Congress does have some greater familiarity with "legislation" and "appropriations" than the average uninformed citizen. *Environmental Defense Fund v. Froehlke*, 348 F.Supp. 338, 364 (W.D.Mo.1972).

10. Lobbying with appropriated moneys—No part of the money appropriated by any enactment of Congress shall, in the absence of express authorization by Congress, be used directly or indirectly to pay for any personal service, advertisement, telegram, telephone, letter, printed or written matter, or other device, intended or designed to influence in any manner a Member of Congress, to favor or oppose, by vote or otherwise, any legislation or appropriation by Congress, whether before or after the introduction of any bill or resolution proposing such legislation or appropriation; but this shall not prevent officers or employees of the United States or of its departments or agencies from communicating to Members of Congress on the request of any Member or to Congress, through the proper official channels, requests for legislation or appropriations which they deem necessary for the efficient conduct of the public business.

18 U.S.C. § 1913 (emphasis added).

*Constitution* embrace every exercise of legislative power, in the broadest sense of that term, and specifically such matters as the making of budgets and the appropriation of money for county expenses . . . which may be, at least in part, legislative functions.

61 A.2d at 673–74. The court held that the phrase "enact legislation" in the Maryland Constitution did not encompass the making of budgets and the appropriation of money for county expenses.

The Supreme Court of Arizona has also ruled similarly. In a case where the State Auditor contended that a general appropriation bill unconstitutionally violated the provision of the state's constitution restricting each act to one subject, the court held:

> The general appropriation bill is not in the true sense of the term "legislation"; it is, as the language implies, merely a setting apart of the funds necessary for the use and maintenance of the various departments of the state government already in existence and functioning.

*Sellers v. Frohmiller,* 42 Ariz. 239, 24 P.2d 666, 669 (1933) (emphasis added). The court continued at 24 P.2d 670:

> If an act which makes appropriations to the various departments of the state contains, *in addition to appropriations, legislation* of such a nature that its subject must be expressed in the title, this alone would immediately suggest that such legislation could not stand. (Emphasis added.)

The court sustained the auditor's position and denied the writ. This distinction between appropriations and legislation was also recognized in *Carr v. Frohmiller,* 47 Ariz. 430, 56 P.2d 644 (1938), but a different result ensued because the bill did not contain more than one subject. This same distinction has been universally recognized by the parliamentary decisions in Congress.

All precedents in Congress, which in this respect go back as far as 1842, 4 Hinds' Precedents § 3811 (1907) (hereafter "Hinds' "), make a distinction between "legislation" and the "appropriation" of money by Congress and prohibit the *change* of any existing laws (legislation) in any general appropriation bill. 4 Hinds' § 381 (1907), §§ 3812, 3813. The enactment of positive law where none exists is construed as "changing existing law" within the rule. *Id.,* §§ 3812, 3813, and thus although the initial legislation *authorizing* a program in need of supply may be "legislation," subsequent appropriations are not. For the lengthy list of congressional precedents involving decisions as to what constitutes legislation, *see* 9 Cannon's Precedents, Index, pp. 190–91(72) (hereafter "Cannon's").

Further support for the position that the intent of Congress was, and is, that "legislation" be restricted to those instances where there has been a "change of law" is found in the doctrine that limitations upon appropriations are not considered to constitute legislation. 7 Cannon's § 1710. Thus, for example, an amendment that proposes to defer disbursements from an appropriation until a departmental regulation has been enforced does not constitute "legislation," as it is a limitation on an appropriation bill. *Id.,* § 1581. Even when significant interests and policies are affected by such limitations they are still not considered to be "legislation". For instance, Hinds' in § 3987 reports a ruling that it was in order, by a limitation on an appropriation bill, to withhold the appropriations from a designated object even though a *contractual obligation* of the United States for ocean mail service between the United States and foreign ports may thereby be left unsatisfied. It has also been ruled that a provision in an appropriation bill providing that no sums thereby appropriated for that year may be expended for a reformatory within a radius of ten miles of Mt. Vernon, except the one then located at Occoquan, Virginia, merely amounted to a limitation and was in order in an appropriation bill. 7 Cannon's § 1710 (1935). None of these limitations changed the law, *i. e.,* the statute authorizing the appropriation, hence they were not "legislation."

With respect to appellants' claim that a reduction in an appropriation from one year to another constitutes "legislation," there

are a number of precedential decisions in Congress specifically holding to the contrary. It has been ruled that action by the House cutting down an appropriation below the amount authorized by law is not considered to be legislation. That decision was made by Congressman Tilson of Connecticut who in ruling stated:

"The reason for that rule of limitation is simply this: The House in Committee of the Whole has the right to refuse to appropriate for any object which it may deem improper, although the object may be authorized by law; and it has been contended, and on various occasions sustained by the Committee of the Whole, that if the committee has the right to refuse to appropriate anything for a particular purpose authorized by law it can appropriate for only a part of that purpose and prohibit the use of the money for the rest of the purpose authorized by law. That principle of limitation has been sustained so repeatedly that it may be regarded as a part of the parliamentary law of the Committee of the Whole."

7 Cannon's § 1710 (1935). The foregoing ruling relied upon a prior ruling by Congressman Dingley of Maine reported at 4 Hinds' § 3936, p. 632 (1907). Thus, retrenchment is not a change of existing law, i. e., it is not "legislation" as Congress uses that term.

Important restrictions on the expenditure of appropriated funds may be embodied in an appropriation bill without enacting "legislation." In considering a bill for the appropriation of funds for the Commission of Fine Arts which provided that no part of such sums shall be expended for traveling expenses, other than those incurred by members of the Commission for actual travel only going to and returning from Washington to attend meetings of the Commission, it was ruled that such provision did not constitute legislation. While the provision would prohibit the use of funds for a purpose authorized by law it was nevertheless construed to be a proper limitation and not legislation. The reasoning underlying this ruling is that a provision refusing to continue appropriations to the maximum extent authorized by law, and for the maximum purposes authorized by law, does not amount of legislation. Cannon's § 1656.

During the Sixty-Eighth Congress, existing law provided that investigations could be conducted upon the request of either House, or upon a concurrent resolution of both Houses. An amendment to an appropriation bill offered by Congressman Newton of Minnesota proposed that "no part of the appropriation . . . shall be expended for investigations . . . except those authorized and directed by the concurrent resolution of both Houses." The Chair upheld such limitation in ruling "that Congress may appropriate for one object authorized by law and refuse to appropriate for another object authorized by law," i. e., without such selective appropriation being considered by Congress to constitute legislation. Cannon's § 1595.

The rule prohibiting legislation in appropriation bills is also construed strictly in favor of the point of order. Cannon's § 1707. This permits any single Congressman easily to enforce the rule merely by raising a point of order.

This long history, indicating that Congress, in its uniform practices, does not consider that the appropriation of money constitutes "legislation," convinces me that when it referred to "legislation" in the Environmental Protection Act it did not intend "legislation" to include requests for *authorized* appropriations, when the sums requested do not exceed or vary from the amount Congress has fixed in its *statutory authorization*. It is also evident that the foregoing precedents demonstrate that Congress did not intend to include the rise and fall of annual appropriations for authorized purposes, and within authorized limits, as being within the ambit of "legislation."

While appellees cite the Guidelines of the Council on Environmental Quality, 38 Fed. Reg. 20550, 40 C.F.R. § 1500 *et seq.*, as expert opinion that Congress in NEPA intended to include budget requests within the scope of the EIS requirement applicable to "proposals for legislation . . . or major federal action," it is my view that the

language of these Guidelines is not inconsistent with interpreting the EIS requirement to apply only to legislation *authorizing* appropriations, *i. e.*, to alterations in the existing law, not merely annual budget requests.[11] This conclusion can be reached by comparing the Guidelines' use of "proposals for legislation" and their reference to "authorizations." In any event, the CEQ Guidelines were obviously basing the regulations on the terminology of the statute and—for the reasons hereinbefore outlined—this language does not equate requests for *appropriations* with proposals for *legislation*.

## IV

### Budget Requests as Proposals for Major Federal Action?

Appellees need not persuade that budget requests are "proposals for legislation" in order successfully to contend that such requests should be subject to the EIS requirement, if it can demonstrate that these requests should be considered as "proposals for major federal action." Common sense, however, mandates giving short shrift to this leg of appellees' argument. The NWRS in this case has not proposed any change in budget appropriations, but rather has merely initiated a routine, continuing request for funding. When such requests are made for the first time, thus commencing a new program, or conversely where a decision is made to request no funding at all, thus terminating a program, perhaps such action could plausibly be considered "major"; but I cannot agree that a routine,

annual budget request within the existing legislative authorization, differing in no major degree from those submitted in the past, can credibly be deemed "a proposal for major federal action." Congress would never consider such action as "major," and it is the intendment of Congress that is controlling. The continuation of annual funding—naturally reflecting, in the size of the request, the vicissitudes of economics and elections—works no change in the law. Far from being an example of "major federal action," it might more properly be considered the result of "federal inertia." As has been shown above in refuting the argument that a budget request is a proposal for legislation, supply has traditionally not been deemed to involve a change in the law. Although the CEQ's regulation, 40 C.F.R. § 1500.5(a), stating that "action" includes "requests for appropriations" is entitled to considerable deference, I find no indication whatsoever that Congress meant to elevate normal annual supply concerns to the dignity of "proposals for . . . major federal actions." Accordingly, I disagree with the Council's interpretation of the scope of such term and find EIS requirements inapplicable to the annual budget requests of the NWRS which are the subject of this appeal.

## V

### Requiring an EIS on the Budget Requests and the Traditional Confidentiality of Such Requests

31 U.S.C. § 24 provides that "requests for . . . appropriations which are sub-

11. Appellees cited the following:

1500.2 *Policy*
(a) As early as possible and in all cases prior to agency decision concerning recommendations or favorable reports on proposals for (1) legislation significantly affecting the quality of the human environment * * * (hereafter "legislative actions") and (2) all other major Federal actions * * * Federal agencies will, in consultation with other appropriate Federal, State, and local agencies and the public assess in detail the potential environmental impact.
    *    *    *    *    *    *
1500.5 *Types of Actions covered by the Act*
(a) "Actions" include but are not limited to:

(1) Recommendations of favorable reports relating to legislation *including requests for appropriations*.
    *    *    *    *    *    *
1500.12 *Legislative Actions*
(a) * * * *Agencies should prepare impact statements prior to submission of their legislative proposals to the Office of Management and Budget.* In this regard, agencies should identify types of repetitive legislation requiring environmental impact statements (such as certain types of bills affecting transportation policy or annual construction authorizations.)
Appellees' Brief, p. 22 (emphasis in brief except emphasis on "authorizations" added). The reference to "authorizations" is significant.

mitted to the Office of Management and Budget by the head of any department or establishment shall be prepared and submitted *as the President may determine* in accordance with the provisions of section 11 of this title . . . " This generally calls for various agencies submitting their requests to the President through the OMB. The President reviews all these requests, makes his own decision thereon and then consolidates them in the form of an annual budget which he transmits to Congress. In this connection, pursuant to the authority conferred upon him by the statute that such requests "be prepared and submitted *as the President may determine*," (emphasis added) (*Id.*), the President has determined, *inter alia* :

> 3. *Restrictions on disclosure of agency estimates.* All budget estimates and supporting materials submitted to the Bureau of the Budget are privileged communications. Their confidential nature must be maintained, since they are the basic data and worksheets in the process by which the President resolves budget problems and arrives at conclusions with respect to his recommendations to the Congress. The head of each agency is responsible for preventing disclosure of information contained in such estimates and materials except on request in formal appropriation hearings and when requested by Members of the Congress in connection with their consideration of the budget after its transmittal.

Circular A–10, revised Jan. 18, 1964, Executive Office of the President, Bureau of the Budget, App. 225. The confidential status of such requests is a matter of long standing dating at least from the 1930's, App. 242, 243, and even after the President has

considered budget requests from the various agencies and decided upon the budget he will submit to Congress, the nature and amounts of the appropriations he has determined to request are confidential and are not publicly released until the budget is actually transmitted to Congress. App. 231.

This confidentiality of budget requests until they are formally submitted to Congress by the President is irreconcilable with the appellees' position that these requests should be the subject of Environmental Impact Statements. Congress has been aware of the confidential nature of budget requests, and despite extensive recent legislation concerning the budget process [12] has at no time explicitly suggested that EISs should be filed covering such requests. Perhaps even more significantly, Congress when it so intended has specifically removed the confidentiality of the budget requests submitted by certain agencies. The Consumer Product Safety Commission and the Commodity Futures Trading Commission [13] are examples of agencies whose budget requests have lost the protection of confidentiality. Congress, however, refrained from taking such legislative action with respect to either the Department of the Interior or the OMB.

Moreover, the amendments Congress enacted to the Freedom of Information Act,[14] evince no intent to alter the confidential nature of the communications between the President and units within the Executive Office. The conference report on the 1974 amendments to the FOIA explicitly stated that the term "Executive Office of the President," from which disclosure could be required under the Act, "is not to be inter-

---

**12.** Act of March 2, 1974, Pub.L. No. 93–250, 88 Stat. 11, amended § 207 of the Budget and Accounting Act of 1921, Pub.L. No. 67–13, 42 Stat. 20. The House Committee on Pub.L. No. 93–250 commented "the rest of section 207 deals with the functions of the Office [of Management and Budget], which were transferred to the President by Reorganization Plan No. 2 of 1970 and *which are not changed by the bill.*" H.R. No. 93–697, 1974 U.S.Code Cong. & Admin.News, p. 2779 (emphasis added).

**13.** Consumer Products Safety Act, § 27(k)(1), 86 Stat. 1227, 15 U.S.C. § 2076(k)(1) (Supp. V, 1975); The Commodity Futures Trading Commission Act of 1974, § 101(9), 88 Stat. 1390–1391, 7 U.S.C. § 4(h) (Supp. V, 1975).

**14.** 5 U.S.C. § 552(b)(3) and (5) (Supp. V, 1975) provide exemptions from disclosure for information "specifically exempted from disclosure by statute" and "[certain] inter-agency or intra-agency memorandums or letters," respectively.

preted as including the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President." It is quite true that, by statute, the OMB gives advice to the Congress as well as to the President,[15] so some of its activities would fall outside of the above proviso in the conference committee report, but to the extent that "units" exist within OMB "whose sole function is to advise and assist the President," such activities could be within the proviso. In this connection, 5 C.F.R. § 1303.20(b) states that certain units of the OMB do indeed "solely advise and assist the President" and that among these units are those that provide advice and assistance with regard to "the formulation and preparation of the Federal

**15.** 31 U.S.C. § 20 (1970) provides that the OMB shall provide any appropriate committee of either house "such aid and information as it may request."

**16.** *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

**17.** Section 516.4 of the Department of Interior Manual provides:
  *Responsibilities*
  A. The Assistant Secretary [of the Department of the Interior]—Program Policy * * *.
  (4) Shall review and approve all bureau and office procedures for the preparation and utilization of environmental statements.
  [SEC. 516.5] *Determination of major Federal actions requiring environmental statements.*
  The following criteria are to be used in deciding whether a proposed action requires the preparation of an environmental statement:
  A. Types of Federal actions to be considered include, but are not limited to:
  (1) Recommendations or favorable reports to the Congress relating to legislation, including appropriations.
Appellants' Brief 10–11.
  The "Procedures for Preparation of 102(2)(C) Environmental Statements" which were distributed on November 8, 1974, by the Director of the Fish and Wildlife Service, Department of the Interior, "to be used Service-wide for the preparation of environmental statements" provide:
  3.1 *Statements on Individual Actions.* * * it is the responsibility of the Regional Director to determine whether an environmental statement is necessary for individual actions * * *.

budget." This regulation is entitled to deference.[16] In light of the compelling evidence referred to above that Congress intended budget requests to remain confidential, I would not require an EIS to be submitted with the annual budget request of the NWRS.

## VI

### *OMB and NEPA Obligations*

In considering whether the Office of Management and Budget is "required to develop procedures to fulfill its [alleged] NEPA obligations in connection with the Budget process" concerning the National Wildlife Refuge Service, it is my view that the present regulations of the Department of the Interior and its "procedures" [17] ade-

  3.2 *General (Generic or "Blanket")* Statements. * * * it is the responsibility of the Associate Director Research and Environment to determine whether a general environmental statement should be prepared for a service program or program element * *.

  * * * * * *

  4.0 *Scope and Procedures*: NEPA directs Federal agencies * * * to include a detailed statement of environmental impacts in every recommendation or favorable report on, legislation or other major actions significantly affecting the quality of the human environment * * *.
  * * * * * *

  4.5 *Statements on Individual Actions.* Individual statements shall be prepared for individual actions which have significant impacts on the quality of the human environment, and which are not adequately covered in a general statement. Examples of actions on which statements should usually be prepared include but are not limited to:
  1. Legislation (See Section 4.6)
  * * * * * *

  4.6.1 *Administration Bills.* On draft *legislation* prepared by the Service an environmental impact statement will be prepared.
Appellants' Brief 1–12 (emphasis added). The record also indicates:
  . . OMB also provides that during the legislative clearing process (when OMB solicits the opinions of one agency's *substantive legislative proposals* from other agencies) agencies must submit relevant and available EISs. (OMB Circular A–19, revised July 31, 1972, paragraph 7(d)(2) (App. 249) (App. 239–240). (Emphasis added.)

quately comply with the requirements in that respect and therefore I dissent from the majority's holding that the OMB is required to take the action it commands.

*Conclusion*

In summary, I concur in the holding that the District Court committed error in rendering its declaratory ruling that each annual budget request for the National Wildlife Refuge Service must be accompanied by an Environmental Impact Statement, but I disagree with this court's conclusion that the Secretary of the Interior is under any legal obligation to prepare a programmatic environmental statement on the NWRS program. As the court's opinion points out, it would be absurd to construe the Environmental Protection Act and its implementing regulations to require an EIS with each annual budget request. In my view it is even more absurd—and equally contrary to the language of the statute—to construe the law and the regulation as requiring that the Agency is under any "obligation" to produce the half-way measure of a "programmatic" environmental statement. For the reasons set forth above, I do not feel that an EIS is ever required at the clearly pre-decisional stage at which the OMB or an agency submits a mere appropriation request which has yet to be formally incorporated into the budget transmitted to Congress by the President. I thus conclude that the OMB is not required to establish any new procedures in order to comply with NEPA.